NORRIS et al. v. THE FARMERS' AND TEAMSTERS' CO.

At common law, no bridge or ferry could be erected so near another, bound by law to be provided with attendance, crafts, etc., as to draw away its profits.

And this, upon the principle that such prohibition was for the public good.

In this State, no person has a right to establish a bridge or ferry, so as to receive compensation for the same, unless authorized to do so by license issued according to law.

A free bridge or ferry may be established, without license, provided there is no regularly established bridge or ferry within one mile immediately above or below.

When, however, there is such a bridge or ferry regularly established, then no other bridge or ferry, whether free or not, can be established, within one mile immediately above or below it, unless, in the opinion of the board of supervisors, it is required by the public convenience, etc.

A free bridge or ferry, in the immediate vicinity of one regularly licensed, would be more injurious than the establishment of one regularly licensed to receive toll; as it would render the established crossing of no value whatsoever, while the other would only divide the profits.

To say that the Legislature only intended to prohibit licensed bridges and ferries, and not those which are free, would be to defeat the very object the Legislature had in view.

The fact that a free bridge or ferry so established, within one mile of one already licensed, issued certificates for one dollar, by which the holder was entitled to passage for one month, does not constitute the holder a joint stockholder in the bridge or ferry. It is but another mode of payment, and a mere evasion of the law, and subjects the owners to punishment for a misdemeanor, under the statute.

APPEAL from the District Court of the Sixth Judicial District.

This was an action brought by the plaintiffs, the owners of a regularly licensed bridge, held since 1850, across the American river, at about the termination of Eighteenth street, Sacramento City, (known as Lisle's Bridge,) praying for an injunction, restraining the defendants from running a ferry within one mile of plaintiffs' bridge, and for damages for having so run said ferry.

The complaint also avers a large expenditure upon the plaintiffs' bridge, and a great diminution of travel, by reason of the establishment of defendants' ferry; and also, a renewal of plaintiffs' license, from the board of supervisors, in April, 1856, shortly before the filing of the complaint.

The defence set up is, in effect, that the defendants only have used and are using their ferry for the individual benefit of the owners there-

Norris v. The Farmers' and Teamsters' Co.

of; that they have never ferried over any persons for pay or toll, nor have allowed said ferry to be used as a free ferry; but that the ferry belongs to a joint-stock-company, every member of which, and no others, had the privilege of crossing thereat; that any person might become a member of said joint-stock-company by subscribing one dollar, which entitled the subscriber to a passage over the ferry for one month; which must be renewed every month, if the party desired to continue a member of the association; that tickets to this effect were issued to the stockholders for such undivided interest in the ferry property.

The Court below granted an injunction upon the complaint. After the filing of the answer, upon the return of an order to the defendants to show cause why they should not be attached for contempt for disobedience of the injunction, and upon a submission of the case on the pleadings, the Court below entered an order sustaining the injunction, and ordering the defendants to file additional bonds; from which order, as well as the interlocutory order granting the injunction, defendants appeal. The Court below at the same time filed its opinion, which is adopted as the opinion of this Court.

*J. H. McKune* for Appellants.

The plaintiffs bring their suit for an injunction, alleging an infringement of their rights by running a ferry near their bridge.

The case stands upon complaint and answer, and the appeal is against an order allowing an injunction.

The plaintiffs claim that a license to take toll for crossing their bridge, includes a right to prohibit others from crossing the American river within a certain distance above or below.

The plaintiffs' rights are derived from the first section of the Act of 1855, concerning public ferries and toll bridges. See Session Laws of 1855, p. 182. The section is as follows:

"No person shall demand or receive compensation for the use of any bridge or ferry as a public highway, nor set up and keep, on any private road, a toll-bridge, ferry or constructed ford, so as to receive any remuneration for use of the same, unless authorized so to do by license, as hereinafter provided."

The plaintiffs do not claim a franchise by any ancient grant known to the law, and only claim by virtue of the provision quoted.

All such rights as those claimed by the plaintiffs are vested in the State as a sovereignty, and no individual has any interest in a toll-bridge, or is authorized to collect tolls, or prosecute others for taking away their custom, except those authorized by the statute quoted; and no person is, or by law can, be prohibited by another from crossing at any ferry, or setting up any ferry, unless prohibited by the statute.

Further than this, the Act under consideration prescribes the penalty for infringement of the law. See same statutes, 1855, p. 186, § 18.

When a statute gives a right, and prescribes the penalty for an infringement of the law, the subject is exhausted.

If the punishment is inadequate, it is the fault of the statute.

The subject matter of the statute is however exhausted, and no remedy exists outside.

Now, what are the words of the statute prohibiting the defendants from running their ferry ?

" No person shall demand or receive compensation for the use of a ferry," as a public highway.

The ferry of defendants is on a public highway, and the defendants are inhibited against running their ferry by the words just quoted, or not at all.

There is no allegation in the complaint that the defendants have demanded or received, or are about to demand or receive, any compensation for running any such ferry; and on the contrary, the defendants expressly deny any such charge, if any were made.

The whole scope of the law seems to be, that no party shall for a fee and reward, and for the purpose of business, set up a ferry on a public highway, and thus extort money from the traveling public without a license.

The mere fact that persons who otherwise would cross the bridge of plaintiffs, have joined the said company, and cross in their own, or if you please, another's boat, does not give the plaintiffs a right to restrain defendants.

Fair competition, under the law, is always allowed.

Suppose the case were such :

A built a hotel, and under the law took out a license, and commenced the business of hotel keeping. B afterwards built a hotel adjoining, and in violation of the provisions of the license law, commenced to do the business of hotel keeping, and took away part, or if you will, all the custom of A. B might be prosecuted *criminaliter*, if the law provided a punishment; but I apprehend A could not restrain him from keeping his house, unless the statute in terms gave that remedy.

Again, if A (in the case put) had a large quantity of boarders, and these boarders should join together and hire a cook, and board themselves, no action would lie to restrain such combination.

In this case, the customers of plaintiffs formed themselves into a company to do their own work, and to ferry themselves across the American river, and the only injury done the plaintiffs, is that the men who had been crossing plaintiffs' bridge hired a ferryman, rented a boat, and ferried themselves.

It is submitted that the plaintiffs are not authorized by law to enjoin any such acts.

The plaintiffs claim to hold a license to take toll, under an order of the board of supervisors.

The act of granting a license is judicial.

There is no decision, I believe, to the contrary, and it may be considered settled, so far as authority goes.

The principle is this : that the granting of a license involves the ne-

cessity of adjudicating rights, and this can only be done under our Constitution by Courts of justice.

The board of supervisors, not being a judicial body, cannot do a judicial act; and any attempt so to do is a nullity, and such act void.

The judgment should be reversed, and injunction dissolved.

*Clark & Gass* for Respondents.

This cause was fully presented to the chancellor at the time of the application for the injunction, and as the case was one exciting a good deal of interest, and involving the decision of a question of very general importance, the chancellor gave his opinion in writing. The opinion is an elaborate one, and covers all the points presented in the case.

Since this case was submitted in the Supreme Court, the appellants have filed an additional point in the case, which is in substance, that the granting a license to keep a toll-bridge, or run a ferry for toll, is a judicial act, and that the board of supervisors is not authorized to exercise judicial powers.

The right of having a bridge, with the right to take toll and to exclude other means of crossing is a public franchise. Blisset *v.* Hart, 2 Willes' R., 508; Cruise's Dig., title Franchise, 27; 2 Greenleaf's Cruise on Real Property, p. 66, note 1; 1 Term Reports, 660, 4 Mod., 319.

Franchises are defined to be, branches of the royal prerogative subsisting in the hands of a subject by grant from the king. 3 Cruise's Dig., 278; 2 Greenleaf's Cruise on Real Property, p. 55.

No person can demand the grant of a franchise as a matter of right. It is granted by the sovereign at discretion, and of his own mere motion. It is made, in the language of the older books, "*ex speciali gratia certa scientia, et mero motu regis.*" 2 Black. Com., 347; Comyns Dig., Grant G., 12.

The right to grant franchises belongs to, and is embraced within the right of eminent domain, and eminent domain is a part of sovereignty, and resides in the sovereign, and no person can exercise the right but the sovereign.

In this State the sovereignty resides in the people. The sovereignty of the people, or State, is represented by the State Legislature, and the only way the people can exercise the right of eminent domain is through their representatives in Legislature assembled.

The exercise of this power by the Legislature is political and not judicial.

Among the powers exercised by the several State Governments, since their first establishment, have been the right to grant charters, unless specially prohibited by their several Constitutions. And that right has never been questioned, nor has it been thought that in doing so they were exercising judicial powers. The fact that franchises lie in grant precludes the idea of their flowing from the judicial branch of the Government.

We contend that the Legislature, representing the political power of

the State, is the only department of the government which can exercise the right of eminent domain; that this power, being political, could not be exercised by the judiciary, and that it was constitutional and proper to confer the same upon the boards of supervisors of the several counties, who exercise the power as a board of commissioners on behalf of the Legislature, and we believe we are borne out in this view by the principle laid down by this Court in the case of Roth & Speck *v.* Whitney & Brown, decided April Term, 1856, and the cases of Dickey *v.* Hurlbut, and Burgoyne *v.* the Supervisors of the county of San Francisco.

Mr. Justice HEYDENFELDT delivered the opinion of the Court.    Mr. Chief Justice MURRAY and Mr. Justice TERRY concurred.

The judgment is affirmed upon the reasons given in the opinion of the Judge of the Sixth Judicial District, which is adopted as the opinion of this Court, and ordered to be reported accordingly.

[The following is the decision of the District Court below, referred to in the above, and adopted as the opinion and decision of the Supreme Court—thereby becoming part of the record.]

It appears that plaintiffs are the owners of the bridge crossing the American river, in this county, known as Lisle's bridge ; that the same has been kept as a toll-bridge since 1850 ; that some $30,000 were expended in its erection, and about $10,000 since in repairs.    On the 4th of April, inst., under and by virtue of an order made by the board of supervisors of this county, a new license issued to plaintiffs; defendants, without authority, have established a ferry contiguous to plaintiffs' bridge, whereby the greater portion—about three-fourths of those who, as plaintiffs allege, have been in the habit of crossing over plaintiffs' bridge—now cross over defendants' ferry.    Plaintiffs ask that defendants may be enjoined from using their said ferry to the injury of said plaintiffs.

At common law, no bridge or ferry could be erected so near another, bound by law to be provided with attendance, crafts, etc., as to draw away its profits.    3 Blackstone Com., p. 219.

Upon the principle that such prohibition was for the public good, it was deemed unreasonable to suffer another to interfere with the profits of a bridge or ferry already established at a considerable expense, perhaps, to the owner, as such interference was discouraging to undertakings of the sort, and consequently disadvantageous to the public.    1 Haywood, Law and Equity Rep., p, 526.

If Government, says Judge Story, means to invite citizens to enlarge the public comforts and conveniences, to establish bridges, etc., there must be some pledge that the property will be safe, that the enjoyment will be co-extensive with the grant, and that success will not be the signal of general combination to overthrow its rights and take away its profits.

In the case of Smith v. Hawkins et al., 3 Wendell Rep., p. 618, Chief Justice Ruffin, in delivering the decision of the Court, remarks:

"It is a decision of the common law, that if a ferry be erected so near an ancient ferry on the same stream as to draw away its custom, it is a nuisance to the owner of the old one; and it was held by this Court in the case of Long v. Beard and Merrill, 3 Mur., p. 57, that in such a case an action lies by the owner of the first ferry against the owner of the new one, although the latter be a free ferry—for the injury to the plaintiff was not in the gains of the defendant, but in drawing away the travel, and thereby diminishing his tolls and the value of his franchise. The reason for this, as given by Mr. Blackstone, is that the owner of a ferry is bound to the public to keep it in repair and readiness for the use of the citizens, and that he cannot do if his franchise may be invaded, or if the income of the bridge or ferry may be curtailed by diverting passengers by means of a rival unauthorized establishment of a like kind. Therefore, although the public convenience is the occasion of granting franchises of this nature, and, for example, the ferry established on the road chartered is *publici juris*, yet the property is private, and consequently an injury to it may be the subject of an action, for no person could be expected to serve the public by bestowing his time, labor and money in establishing a ferry or erecting a bridge, if its value could be immediately destroyed by the caprice or malice of private persons, in adopting means of drawing away the custom to some establishment of their own. It is, then, truly the interest of the public, as well as an instance of the private justice due to an individual, that the public grant of franchises of this kind should be protected by being held to be exclusive in the grantee, unless legally and duly ordered otherwise by the public authorities."

Hence not only did the common law give redress for the invasion of the franchise of a ferry by an action, but upon its being found that such redress was not adequate, equity interposed the more effectual remedy and restraint of injunction. It is obvious that from the difficulty of proving the extent of the injury from time to time, and from the constant litigation arising out of the repeated invasions of the right that must naturally be expected from a rival erection, the relief in equity is highly salutary, and, indeed, is the only remedy that has any pretensions to be deemed adequate. The cases are numerous of redress in that method. In a case in the Exchequer—Lord Hale presiding—the owner of lands on both sides of the Thames set up a ferry three-quarters of a mile from an ancient ferry, and there was a decree to suppress it on the bill of the owner of the old ferry. 2 Anstruth., p. 608. The same principle was acted on in this State, in the case of Long v. Beard. It is true that then the defendant received pay, and therein expressly violated the statute, but the relief would have been granted without that circumstance. Upon the general principles stated in the latter part of the opinion, we consider there the law of the case well settled.

The same doctrine is laid down by Chancellor Kent, in the case of the President, etc., of the Croton Turnpike Road v. Ryder et al. 1

Johns' Ch. Rep., p. 610. Where a turnpike company, incorporated with privileges of erecting toll gates and receiving toll, had duly opened and established the road, with gates, etc., and certain persons, with a view to avoid the payment of toll, opened a by-road near the turnpike, and kept it open at their own expense for the use of the public, by which travelers were enabled to avoid passing through the gate and paying toll to the plaintiffs, the Court granted a perpetual injunction to prevent the defendants from using or allowing others to use such road, and ordered the same to be shut up.

The chancellor, in his decision, says : "It is, then, a plain case of a material and mischievous disturbance of the plaintiffs in the enjoyment of the statute privilege, which was granted to them for public purposes, and founded on a valuable consideration. The only question is as to the remedy, and this appears to me to be equally certain. It is settled that an injunction is the proper remedy to secure to a party the enjoyment of a statute privilege of which he is in the actual possession, and when his legal title is not put in doubt. The English books are full of cases arising under this head of equity jurisdiction. The equity jurisdiction in such a case is extremely benign and salutary ; without it, the party would be exposed to constant and ruinous litigation, as well as to have his right excessively impaired by frauds and evasion."

Again, the same learned judge, in the case of the Newburg Turnpike Company v. Miller, 5 Johns., Ch. Rep., 101, further establishes the same doctrine. In that case the plaintiffs had erected a toll-bridge over the river Wallkill, in connection with a turnpike, under an act of the Legislature, and the defendant afterwards erected another road and bridge near to the former, and thereby diverted the toll from the plaintiffs' bridge. In granting a perpetual injunction, the Court said : "Considering the proximity of the new bridge, and the facility that every traveler has, by means of that bridge, and the road connected with it, to shun the plaintiffs' gate, which he would otherwise be obliged to pass, I cannot doubt for a moment that the new bridge is a direct and immediate disturbance of the plaintiffs in the enjoyment of their privilege. The *quo animo* is not an essential inquiry in the case ; whatever may have been the intention of the defendants, the new road and bridge do directly and materially impair the use and value of the plaintiffs' franchise ; the new road, by its termini and its vicinity, creates a competition most injurious to the statute franchise, and becomes what is deemed in law, in respect to such a franchise, a nuisance. No rival road, bridge, ferry, or other establishment of a similar kind can be tolerated so near to the other as materially to affect or take away its custom. It *operates as a fraud upon the grant*, and goes to defeat it. The consideration by which individuals are invited to expend money upon great, expensive and hazardous public works, as roads and bridges, and to become bound to keep them in constant and good repair, is the grant of a right to an exclusive toll. This right cannot be taken away by direct or indirect means, devised for the purpose."

In the case of Gates v. McDaniel & Spurlin, 2 Stewart's Alabama

R., 211, the plaintiff was the owner of a public ferry, established by law. The defendants built a bridge near it, without authority, and suffered all persons to pass free of toll, whereby the profits of the ferry were lost. The judge, in his decision, says: "I am decidedly of opinion that the defendants had no right to build a public bridge within the immediate vicinity of the ferry. The complainant had regularly made his application in the County Court, entered into bonds as the law directs, and was liable to be sued on that bond if he failed to comply with its conditions. Certainly, then, he must receive the protection which he had a right to expect when he gave this bond." Also, see 5 Howard's Miss. R., 503.

In this State no person has a right to establish a bridge or ferry so as to receive compensation for the same, unless authorized to do so by license issued by order of the board of supervisors. A free ferry or bridge may be established, provided there is no regularly established bridge or ferry within one mile, immediately above or below. When, however, such is the case—when the board of supervisors has granted a license authorizing the erection of a public bridge, or the establishment of a public ferry, then no other bridge or ferry, whether free or not, can be established within one mile immediately above or below it, unless, in the opinion of the board of supervisors, it is required by the public convenience, etc. Section 6th, Act concerning public ferries and toll bridges, Laws 1855, p. 184.

It has been urged that, although the board of supervisors has no right to establish a bridge or ferry within one mile of one regularly licensed, except in cases provided by statute, yet any one can establish a free bridge or ferry. Such is not the law; a free bridge or ferry, in the immediate vicinity of one regularly licensed and receiving toll, would be much more injurious than the establishment of a regularly licensed bridge or ferry—for the one would only divide the profits, the other would be apt to render the bridge or ferry receiving toll of no value whatsoever. If the board of supervisors, representing the county, is prohibited from establishing a ferry or bridge within a prescribed distance, to the injury of plaintiffs, can it be said that individuals, without any grant or license, can establish a ferry or erect a bridge without incurring liability, although they thereby destroy the benefit of the franchise granted, and ruin the plaintiffs? Most certainly not. Bridges and ferries are of the highest utility and convenience to the public. The Legislature, knowing this, and desirous of encouraging their erection and establishment, and being, at the same time, aware that they could not be built or established without large outlays of money, and that the profits accruing from them were not certain—as an inducement, authorized certain exclusive rights and privileges to be granted and conferred: among others, that no other bridge or ferry should be erected or established within one mile.

To say that the Legislature intended merely to prohibit other licensed bridges or ferries, and not those which were free, would, in my opinion, be charging the Legislature with an absurdity in the passage of the

bill. It would defeat the very object the Legislature had in view. What security is there that a free bridge or ferry will be kept up? The immediate effect of a free bridge or ferry, immediately adjoining one licensed, is to render the bridge or ferry receiving toll unprofitable, and consequently, if without protection, they would be abandoned, and permitted to go to decay. If, then, the free ferry stops, what is the result? No one can again be expected to trust the public faith by erecting another toll-bridge, which may again be rendered of no value by a rival free bridge, and the consequence is the public convenience is injured or destroyed. Smith *v.* Hawkins, Iredell Equity Rep., vol. 3, p. 622.

The defendants, in their answer, allege that they have combined and formed a joint-stock-company. They do not pretend that they have any license from the board of supervisors, but they allege that their ferry is private, not public, and established for their own use. What are the facts? The defendants issue tickets and sell them to any one who will purchase. Travelers, teamsters, etc., who otherwise would cross over plaintiffs' bridge and pay toll, are met and requested by defendants or their agents to purchase tickets and cross on defendants' ferry. The purchaser of a ticket pays one dollar for the same, and is authorized to cross at defendants' ferry for one month. The purchaser of a ticket, defendants allege, becomes a joint owner, and has a joint interest in the ferry for one month. What a purchase! In what has he a joint interest? In nothing, except the privilege of crossing over in the ferry for the period of one month. But, even if, by the purchase of a ticket, he does become invested with a joint interest in the ferry, nevertheless it is a clear and palpable attempt to evade the law. The evasion of a law is a violation of it. Courts of justice never uphold an evasion. The spirit of a law, as well as its letter, must be respected. That a person can ferry himself across a river in his own boat, no one will deny; but he has no right to use it, or permit it to be used, so as seriously to injure others. To permit teamsters and travelers, under the false pretence of being joint owners, to cross over in his boat, when otherwise they would cross the established bridge, is a violation of the law and of the rights of the proprietors of the bridge. Long *v.* Beard & Merrill, 3 Murphy's Rep.; Harrell *et al. v.* Ellsworth, 17 Ala. Rep., 584.

How can the ferry of defendants be more public than it is? Any one, on the payment of one dollar, can cross over in it for the period of one month. Not only is the ferry of defendants a public one, but they are receiving toll and running the ferry in direct violation of the statute. The dollar paid for the ticket is the toll charged for crossing. Section 18 of the Act concerning public ferries, Laws of 1855, p. 186, makes it a misdemeanor for any person to keep a ferry, and receive compensation for the use of the same, without first obtaining a license.

The plaintiffs have expended large sums in the erection and repair of their bridge. They have been duly licensed by the board of supervisors; they have executed a bond to keep the bridge in good repair

and condition; to give free passage to all public messengers and expresses; to pay to any person delayed, injured or damaged, by reason of any defect or insufficiency of said bridge, all damgaes that such person may recover therefor, in any Court of competent jurisdiction.    Act concerning public bridges, etc., Laws 1855, § 16, p. 186.

They are compelled to cause the banks of the streams to be graded and kept in good passable order for the passage of loaded wagons and other vehicle.    Sec. 22.

They are obliged, at all hours of the night, to give passage to all persons requiring the same.    Sec. 21.

It will be seen that heavy burdens and duties are imposed upon plaintiffs.    They are bound by the obligations of their contract; whether it turns out to be good or bad, productive or unproductive of profit, does not vary their duties; they must, during the term of their license, keep their bridge in good repair for public travel.    If they fail to do so, and any one is injured or delayed thereby, they are compelled to respond in damages.    They could not "urge, as a defence or apology, that their tolls were inadequate, that their repairs were expensive, or that the whole concern was a ruinous enterprise."    In consideration of the burdens imposed, the law says plaintiffs shall be protected in the enjoyment of those rights and privileges which the statute confers upon them.    The law will not sanction the establishment, without authority, of a ferry so contiguous to plaintiffs' bridge as to destroy the profits, annihilate the tolls, while the burdens and responsibilities remain the same.

The defendants, in their answer, seek to impeach the validity of the license granted to plaintiffs; but this cannot be inquired into in a collateral way.    The law is too well settled on this point to need discussion.    17 Ala. Rep., 576; Conner *v.* Paxon, 1 Blackf. R., 68.

The defendants in this case, I regret to say, are not only running their ferry in open violation of law, but have evinced a disposition to evade and violate the restraining orders issued by this Court.    If the public travel and convenience demand the establishment of a ferry in the neighborhood of plaintiffs' bridge, let defendants apply to the proper authorities and obtain a license.    If the law is unjust and oppressive, apply to the Legislature and have it changed.    The Court must enforce the law as it exists; it has no option in the matter.    No one, I think, can examine the law of this case, and say that defendants ought not to be enjoined.    If, however, I have mistaken the law, defendants have their remedy by appeal; but, until the orders of this Court are reversed, they should be respected, and not sought to be evaded.    An injunction must issue, in accordance with the prayer of plaintiffs' complaint, and the ferry of defendants be abated until the final hearing of this case.

A. C. Monson, District Judge.