[Civ. No. 44902. Second Dist., Div. Three. July 21, 1975.]

NO OIL, INC., et al., Plaintiffs and Appellants, v.
OCCIDENTAL PETROLEUM CORPORATION,
Defendant and Respondent;
CALIFORNIA COASTAL ZONE CONSERVATION
COMMISSION et al., Interveners and Appellants;
PACIFIC PALISADES LANDOWNERS ASSOCIATION,
Intervener and Respondent.

**COUNSEL**

Michaels, Ornstein & Kontos and Robert M. Ornstein for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, Carl Boronkay, Assistant Attorney General, Robert B. Keeler and David R. Goldman, Deputy Attorneys General, for Interveners and Appellants.

Hanna & Morton, Harold C. Morton, Edward S. Renwick, Lauren R. Brainard, Mitchell, Silberberg & Knupp and Arthur Groman for Defendant and Respondent.

Hindin, McKay, Levine & Glick, Allan L. Levine and A. Tod Hindin for Intervener and Respondent.

John Roger Beers, John E. Bryson, Ballard Jamieson, Jr., and Laurens Silver as Amici Curiae.

**OPINION**

**POTTER, J.**—Plaintiffs No Oil, Inc., et al. (hereinafter "No Oil"), and intervening plaintiffs South Coast Regional Commission and California Coastal Zone Conservation Commission (hereinafter "Coastal Commissions") appeal from a judgment in favor of defendant Occidental Petroleum Corporation[1] (hereinafter "Occidental") and intervening defendant Pacific Palisades Landowners Association (hereinafter "Landowners Association"). The action was based upon the California Coastal Zone Conservation Act of 1972 (hereinafter "Coastal Initiative") (Pub. Resources Code, §§ 27000-27650). The relief sought included (1) an injunction restraining defendant Occidental from proceeding with a development comprising exploratory drilling for oil and gas and "testing to determine productivity of subsurface formations" within the "permit area" defined in section 27104 of the Public Resources Code[2] without a permit pursuant to section 27400, (2) a declaratory judgment that such development requires such a permit, (3) civil penalties as provided by sections 27500 and 27501, and (4) costs and reasonable attorneys' fees of plaintiffs.

The only issue raised by the answers filed on behalf of defendant Occidental and intervening defendant Landowners Association was the claim that the development was exempt from the permit requirement of section 27400 by virtue of the fact that prior to February 1, 1973, Occidental had in good faith lawfully commenced and performed substantial construction work in reliance upon three ordinances of the City of Los Angeles creating drilling districts encompassing the site of

---

[1]Occidental also was a cross-complainant for declaratory relief. Such status, however, is not pertinent to any matters involved in this appeal.

[2]References hereinafter to code sections are to Public Resources Code sections unless otherwise designated.

such construction and upon city permits issued on the basis of the existence of such districts.[3]

After trial to the court without a jury, judgment was entered in favor of defendants and against plaintiffs (1) denying injunctive relief, (2) denying civil penalties; (3) declaring that Occidental, "having commenced physical onsite construction prior to February 1, 1973, and having performed substantial lawful construction prior to February 1, 1973, is not required to obtain a permit under the California Coastal Zone Conservation Act in order to complete the two temporary bore holes contemplated by Los Angeles City Ordinances No. 144020, No. 144021 and No. 144022" (the ordinances creating the drilling districts), and (4) awarding attorneys' fees in the sum of $32,750 to defendant Occidental and attorneys' fees of $2,500 to intervening defendant Landowners Association in addition to their respective costs. The appeal is from the entire judgment.

*Facts*

This litigation is one phase of a contest, which has continued over a period of years, between proponents and opponents of oil drilling in the coastal area of Los Angeles generally referred to as Pacific Palisades. The other phase of this contest related to the effect of the California Environmental Quality Act (hereinafter "CEQA") (Pub. Resources Code, § 21000 et seq.) upon Occidental's proposed oil and gas exploration. The "chronology of events" of that other phase are set forth in the opinion of our Supreme Court in *No Oil, Inc.* v. *City of Los Angeles,* 13 Cal.3d 68, 76-79 [118 Cal.Rptr. 34, 529 P.2d 66] (hereinafter referred to as *"No Oil, Inc."* and "CEQA litigation"). Insofar as pertinent to this appeal, those facts are as follows:

"1. *Chronology of events.*

"In 1966 Occidental Petroleum drilled the Marquez Core Hole in Santa Monica Canyon and discovered oil producing sands at a depth of 9,200 feet. Seeking to determine the extent of the oil field, Occidental acquired the 'highway drillsite' in Pacific Palisades in 1969. This two-acre site lies across a state highway from Will Rogers State Beach and near the foot of a bluff [which] has experienced numerous landslides.

---

[3]It was Occidental's position that it had thereby performed "substantial lawful construction" justifying exemption under the rule of *San Diego Coast Regional Com.* v. *See the Sea, Limited,* 9 Cal.3d 888, 890 [109 Cal.Rptr. 377, 513 P.2d 129] (hereinafter referred to as *"See the Sea"*).

"In July of 1970, the Office of Zoning Administration of the City of Los Angeles granted Occidental a conditional use permit allowing it to drill a test well at the highway drillsite. The board of zoning appeals overturned that decision, finding that the drilling might trigger a disastrous landslide, that a blowout—an uncontrolled effusion of oil under pressure—would have severe environmental consequences, and that an industrial use of the site would be aesthetically undesirable.

"Seeking to circumvent the requirement for a conditional use permit, Occidental petitioned the city in 1972 to establish three oil drilling districts in the Pacific Palisades. Since the oil drilling districts proposed by Occidental would have permitted commercial oil production, the hearing examiner for the city planning commission, concerned about the environmental impact of such production, recommended disapproval of the proposal. Nevertheless the planning commission resolved to approve the proposal on condition that only two test holes be drilled.

"On October 10, 1972, the council considered three ordinances which established oil drilling districts in the Pacific Palisades area, subject to the condition that only two test wells could be drilled. At the close of the hearing Councilman Wachs inquired whether the city attorney had examined the proposed ordinances in the light of our opinion in *Friends of Mammoth* filed three weeks earlier. The city attorney replied that since the city had not yet established procedures to ascertain the environmental impact of measures coming before the council, he had made no such examination.

"At the next meeting, on October 17, Councilman Wachs moved to postpone consideration of the ordinances pending preparation of an EIR. No other councilman discussed the motion, which failed by an eight-to-six vote. The council then passed the ordinances by the same eight-to-six vote. Mayor Yorty signed the ordinances into law on October 20.

"Plaintiffs, four nonprofit corporations representing persons opposed to oil drilling in Pacific Palisades, filed the instant action on October 27. Their complaint sought a declaration that the ordinances were invalid, prayed for mandate to compel preparation of an EIR, and requested an injunction against the issuance of a drilling permit by the office of zoning administration. The city, in response, contended that no EIR was necessary, supporting this contention with declarations from the eight councilmen who voted for the ordinances; each declared, in the statutory

language, his opinion that the drilling project was not such as might have a significant effect on the environment. Occidental, on the other hand, maintained that the reports of the planning commission constituted a sufficient EIR.

"    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"On December 29, 1972, the judge announced an oral ruling. Declaring that the council's actions of October 10 and 17 were equivocal, he resolved to remand the matter to the council for clarification of the council's position on the question: 'Is the present Occidental application to drill two core holes such a project that may have a significant effect on the environment?'

"In remanding the matter, the court stated a test for use by the council in determining whether a project 'may have a significant effect on the environment': 'whether there is a reasonable possibility that the project will have a momentous or important effect of a permanent or long enduring nature.'

"The council convened on January 8, 1973. At the conclusion of the hearing the council, by an eight-to-seven vote, adopted a resolution stating that 'the Los Angeles City Council specifically declare that at the time it adopted the subject three ordinances it believed, and now specifically finds, that such ordinances and the restricted activities permitted thereby would have no significant effect on the environment.'

"The superior court found that the council's adoption of this resolution was supported by substantial evidence in the administrative record both as of October 1972, and as of January 8, 1973. It then entered judgment declaring that the council lawfully determined that no EIR was required for the drilling project, and denying plaintiffs' request for mandate and injunctive relief.

"Plaintiffs appealed and unsuccessfully sought a stay order from the Court of Appeal. Since the appeal presented issues of public importance, which would be mooted if Occidental completed the drilling project pending appeal, we ordered the cause transferred to this court, issued a stay order and returned the cause to the Court of Appeal. (See *People* ex rel. *S.F. Bay etc. Com.* v. *Town of Emeryville* (1968) 69 Cal.2d 533, 537 [72 Cal.Rptr. 790, 446 P.2d 790].) The action is now here on petition for hearing from the Court of Appeal decision. [Fns. omitted.]"

To complete this chronology we add that this court by its opinion filed December 20, 1973, affirmed the superior court judgment. Thereafter on January 28, 1974, a petition for hearing in the Supreme Court was filed by plaintiffs and on March 8, 1974, the petition for hearing was granted.

The chronology of events relating to the Coastal Initiative phase of the contest as set forth in the findings of the trial court in this matter[4] is as follows: After the signing of the three drilling district ordinances on October 20, 1972, "Occidental, in the ordinary course of business and in good faith, diligently commenced work on the development" to carry out the drilling of the two core holes contemplated by the drilling district ordinances. Prior to the effective date of the Coastal Initiative (Nov. 8, 1972) these expenditures totaled $12,941. Thereafter on or about November 24, 1972, Occidental filed with the Office of Zoning Administration of the City of Los Angeles applications requesting that the administrator determine which of two drill sites would be used for the exploratory drilling operation contemplated by the drilling district ordinances and the method of operation to be used thereat. Occidental continued in good faith to perform work on the prospective development consisting of completion of an operating plan, surveys, preparations for vibrational monitoring activities, title work, conduct of sound studies, engineering studies and provision of materials and equipment. These preparations had a value in excess of $126,579 through January 30, 1973.

As a result of the pendency of the CEQA litigation, the associate zoning administrator did not process Occidental's application to determine the drill site and the methods of operation in the ordinary course of business. This resulted in a delay from mid-December 1972 until January 4, 1973, in the issuance of his determination. That determination would have been final on January 19, 1973, but for the fact that five of the plaintiffs herein filed a notice of appeal with the Board of Zoning Appeals of the City of Los Angeles. One purpose of filing that appeal was to attempt to delay the effective date of the determination of conditions until after January 31, 1973, and thereby prevent Occidental from commencing construction before February 1, 1973, as required to secure exemption from the Coastal Initiative under section 27400 of the code.

The hearing on the appeal was held before the Board of Zoning Appeals on January 30, 1973, at which time the determination of the

---

[4]For the most part these facts are not disputed insofar as they are pertinent to the basis upon which this appeal is herein decided.

associate zoning administrator was sustained and the appeal thereon was denied. In order to be able to proceed on January 31, in the event the appeal was denied, defendant Occidental on January 30 transported necessary equipment and materials to the drill site designated in the determination of the associate zoning administrator.

Finding No. 30 deals with the conduct of defendant Occidental on January 31, 1973. It reads as follows: "30. On January 31, 1973 in the ordinary course of business and in good faith, Occidental diligently commenced construction activities at the Highway Drillsite. Said construction activities consisted of unloading equipment from the trucks, completing one-third of an eight foot high fence around the drillsite, which involved implacement, without cementing of posts, and placement between said posts of prefabricated sections of plywood fencing, clearing off the site, clearing off a dirt road leading to vibration monitoring and earth deformation recorder sites adjacent to the drillsite, drilling two shallow test holes (one purpose of which was to provide information regarding attenuation of vibrations in the surface soils), performing electrical work in providing electricity to a guard shack, completing erection of a portable guard shack, performing survey work, performing plumbing work relative to providing water to the site, one-fifth of the work of sorting, arranging, and connecting pieces of the oil drilling derrick which had been unloaded from trucks into piles on the ground, assembling the celler box, drilling by means of a portable truck-mounted rig the first forty feet of hole in each of the two bore holes, setting conductor pipes thirty inches in diameter and forty feet in length therein, and cementing said conductor pipes into place. The foregoing work took approximately nine hours. Said work and materials as well as liabilities incurred therefor were substantial in amount and were of a value of approximately $12,575."

At the trial which commenced March 1, 1974, and concluded March 13, 1974, evidence substantially supporting the facts as above stated was received. In addition, such evidence supported other findings to the effect that none of the preparatory work or construction performed by the defendant Occidental would have been undertaken if the drilling district ordinances had not been passed and the construction work described in finding No. 30 would not have been performed if the determination of the associate zoning administrator had not been issued and the appeal therefrom denied, and that but for the filing of the CEQA litigation by plaintiff No Oil, defendant "Occidental, in the normal course of business, would have completed a considerably greater amount

of work prior to February 1, 1973 than was in fact completed prior to that date."

The court also found that the on-site construction work which commenced on January 31, continued thereafter until the afternoon of February 7, 1973, at which time such activities were suspended by reason of the writ of supersedeas issued by the California Supreme Court in *No Oil, Inc.*

Finally, taking into account the possibility that an appellate court might disagree with the judgment in favor of defendants the trial judge found the reasonable value of services rendered on behalf of each of the parties to the action. Though no award of fees was made to plaintiffs, the value of the legal services rendered to them was set at $21,000 for plaintiffs No Oil and $14,000 for intervening plaintiffs Coastal Commissions.

No provision was made in the judgment for the contingency that our Supreme Court might reach a result in *No Oil, Inc.* contrary to that reached in the superior court and in this court. However, on several occasions cognizance was taken of the pendency of the appeal, its progress, and the relationship between the validity of the drilling district ordinances therein questioned and the lawfulness of the construction activities engaged in by defendant Occidental on January 31, 1973. The first reference to the CEQA litigation as a factor affecting the lawfulness of Occidental's drilling activities occurred in the testimony of the associate zoning administrator as to the cause for his delay from mid-December 1972 to January 4, 1973, in the issuance of a determination of conditions. Counsel for Occidental described this testimony as follows: "The witness had already testified at some point here that because of the existence of the lawsuit, *and the possibility that the drilling districts would be overturned,* he had simply set this aside and had not worked on it." (Italics added.)

Another reference to that litigation is contained in finding No. 34 where the "supersedeas issued by the California Supreme Court" is mentioned. The issuance of such a supersedeas carried the inference that if the Supreme Court reached a conclusion contrary to that of the superior court and of this court, Occidental's drilling activities were unlawful. Furthermore, the possibility of that happening was expressly suggested by counsel for intervening plaintiffs in oral argument. Refer-

ring to the decision of this court and the effect of the granting of a hearing by the Supreme Court on March 8, 1974, counsel said:

"The Friends of Mammoth case was decided by a 6-to-1 vote. In the No Oil vs. City of Los Angeles case, they have now granted a hearing, thus superseding Justice Cobey's opinion, and that will not make it in the final reports. And I think since the issue there is whether the Friends of Mammoth rule is to be strictly or—"

At this point the court interrupted counsel to state: "THE COURT: Look, I've got enough trouble with the coastal zoning matter."

Various comments by counsel and the court also indicate recognition of the effect that an ultimate decision invalidating the drilling ordinances would have. In the course of oral argument the following colloquy occurred between the court and counsel for intervening plaintiffs:

"THE COURT: You say absent the drilling ordinances they have no business with their rig on this property.

"MR. FREEDMAN: Exactly."

Counsel for defendant Occidental in oral argument stated: "[T]he permit to which we point is the three drilling district ordinances that are in evidence in this case, I believe, as exhibits 11, 12 and 13. And I say that they constitute a permit for this reason: That is the final discretionary determination as to whether two information bore holes will be drilled in the Pacific Palisades in these three oil drilling districts." At another place in his argument counsel stated: "And what they are trying to say is that we commenced—well, that in deciding whether we commenced before February 1, you have got to exclude anything that is rendered null and void by reason of being contrary to law."

The court did not agree with Mr. Renwick that the drilling district ordinances constituted the only permit required but said: "They may have been a necessary step, and were. But I don't think that's the type of permit that I should recognize."

Plaintiffs contended in the trial court that over and above the requirement under CEQA for a negative declaration or an Environmental Impact Report (hereinafter "EIR") with respect to the adoption of the drilling district ordinances a new negative declaration or EIR was required as a condition precedent to the determination of the drill site and of the conditions for drilling. This contention was opposed by Occidental on the ground that it constituted a collateral attack upon the action of the associate zoning administrator and the Board of Zoning Appeals of the City of Los Angeles in a proceeding to which the city was not a party. The court's comment, quoted above, to the effect that he had "enough trouble with the coastal zoning matter" suggests acceptance of Occidental's contention that compliance with CEQA was not an issue to be determined in this action. There was, however, included as a finding of fact the following conclusion: "32. All permits required as a necessary prerequisite to said work performed on January 31, 1973 had been obtained prior to the time the work was done. None of said work was prohibited by law." And conclusion of law No. 1 read as follows: "1. Occidental Petroleum Corporation commenced physical onsite construction on January 31, 1973. The construction performed that day was substantial and lawful and performed in good faith."

The effect of the decision of our Supreme Court in *No Oil, Inc.,* rendered December 10, 1974, holding that the three drilling district ordinances were not validly enacted, therefore, poses a primary issue on this appeal.

### Contentions

Defendants contend that the decision of the Supreme Court in *No Oil, Inc.* has no effect upon the propriety of the judgment rendered in this action because (1) the requirement of "substantial lawful construction" stated in *San Diego Coast Regional Com. v. See the Sea, Limited, supra,* was satisfied by compliance, "in good faith, with all existing city ordinances and procedures" despite subsequent invalidation of such ordinances, (2) that the Supreme Court decision in *No Oil, Inc.* did not declare the drilling ordinances void *ab initio,* only voidable, (3) that the claimed invalidity of the drilling ordinances was not and could not have been raised in this litigation by plaintiffs in the trial court (because it was a collateral attack upon the ordinances) and that such claim is therefore not available on appeal, and (4) that the judgment of the trial court herein is not subject to attack on the basis of an occurrence subsequent to its rendition. The issues thus presented are:

*Issues*

1. In light of the decision of the Supreme Court in *No. Oil, Inc.*, was the substantial construction performed by defendant Occidental "substantial lawful construction" within the meaning of that term as used in *See the Sea?*

2. Is the judgment in this case subject to reversal on the basis of the subsequent decision of the Supreme Court in *No Oil, Inc.?*

■ *In View of the Decision in* No Oil, Inc.; *the Activities of Defendant Occidental on January 31, 1973, Were Not "Substantial Lawful Construction"*

By its decision in *See the Sea* our Supreme Court established the requirement for exemption from the permit provisions of section 27400 et seq. of the Code in the following terms: "We have concluded the act requires a coastal permit for construction commenced after 1 February 1973, but does not require one for builders performing substantial lawful construction of their projects prior thereto." (9 Cal.3d at p. 890.)

The meaning of this language is illuminated by the court's reference to an opinion of the Legislative Counsel rendered prior to the passage of the act and described in the opinion as follows: "It should here be added that the Legislative Counsel, by opinion rendered nearly two months prior to passage of the act, concluded that a person who, prior to 1 February 1973, in good faith lawfully commenced construction, performed substantial work, and incurred substantial liabilities would be allowed to complete the development without a coastal permit." (9 Cal.3d at p. 892.) An examination of the opinion referred to discloses that in the question posed the Legislative Counsel was "asked . . . to assume that such person has met all other requirements of law."

We conclude from the foregoing that both good faith and lawfulness are required conditions to exemption from the coastal zone permit requirement on the basis of construction commenced prior to February 1, 1973, and that "lawful" means in that context that all other requirements of law have been met. Defendant's contention that good faith obviates the requirement of lawfulness is untenable.

It is, therefore, necessary to determine the effect of the Supreme Court's decision in *No Oil, Inc.* upon the lawfulness of defendant

Occidental's construction activities on January 31, 1973. The starting point of this inquiry is the effect of the zoning laws of the City of Los Angeles upon such activity prior to the adoption of the three drilling district ordinances. Examination of the provisions of the Los Angeles Municipal Code demonstrates that drilling for or production of oil, gas or other hydrocarbon substances was not permitted in the area in which Occidental's drill site was located. The only zone in which such activity was permitted was zone M3, the heavy industrial zone (Los Angeles Municipal Code, § 12.20, subd. A18). None of the area encompassed in the three drilling districts was zoned M3. The only other provision of the Los Angeles Municipal Code authorizing drilling for oil was contained in section 13.01, subdivision G, provisions of which were as follows: "The districts within which the drilling for and production of oil, gas or other hydrocarbon substances is permitted, and the conditions applying thereto (subject to further conditions imposed by the Administrator in the drilling site requirements), are described as follows:

"     .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"2. Districts in Urbanized Areas. (For boundaries of districts and special conditions applicable thereto, refer to maps and records in City Planning Office.)"

The maps in effect prior to the adoption of ordinances numbers 144020, 144021 and 144022 did not include any of the area into which Occidental desired to drill. The effect of such ordinances was to adopt maps establishing the boundaries of three new districts in which such drilling could be authorized. Consequently, Occidental could not lawfully drill unless and until the drilling district ordinances became effective.

The decision of our Supreme Court in *No Oil, Inc.* held that the three drilling district ordinances were not validly enacted and ordered the superior court to nullify them. The language of the opinion in this respect is as follows: "The superior court shall set aside the ordinances establishing the oil drilling districts on the ground that the city, in enacting these ordinances, failed to comply with the provisions of CEQA. The city, of course, may choose to reenact these ordinances after complying with the requirements of that act.[25]"

"[25]Occidental suggests that an opinion requiring the trial court to set aside the ordinances will require Occidental to file new applications for the creation of the drilling districts, and compel the city to follow anew all procedural steps preparatory to the enactment of the ordinance. To quiet such apprehensions, we note that our opinion does not compel the

trial court to vacate any action, such as the filing of an application for an ordinance, which may lawfully precede the city's determination whether to prepare an environmental impact report. Occidental has not called our attention to any ordinance or rule of the City of Los Angeles which would, under the circumstances of this case, compel repetition of any actions which may lawfully precede that determination." (13 Cal.3d at pp. 88-89 & fn. 25.)

Footnote 25 was added as a response to a petition for rehearing filed by defendant Occidental which pointed out the large expense incident to the necessity to file new applications. Said petition, however, also sought modification of the opinion to "instruct the Superior Court not to set aside the ordinances establishing the oil drilling districts but to retain jurisdiction and require the City to reconsider these ordinances in the light of this Court's ruling . . . ." In said petition defendant Occidental also referred (as it does in its supplemental brief herein) to *Arizona Public Service Co.* v. *Federal Power Com'n* (1973) 483 F.2d 1275, 1283 [157 App. D.C. 272], and *City of New York* v. *United States* (E.D.N.Y. 1972) 337 F.Supp. 150, 163, as authority for this method of proceeding. In the petition defendant Occidental characterized the modification it sought as "[k]eeping the ordinances alive while requiring complete compliance with CEQA." The Supreme Court's response to this request was to insert footnote 25 in which it kept alive only the "procedural steps preparatory to the enactment of the ordinance . . . which may lawfully precede the city's determination whether to prepare an environmental impact report." Such treatment of the matter was consistent with the court's holding as to the effect of noncompliance with CEQA in the initial purported enactment of the ordinances and the ineffectiveness of any subsequent councilmanic action pursuant to remand by the superior court to validate such original action. In this respect the court said: "We do not question the power of a trial court to remand a matter to an administrative agency for clarification of ambiguous findings. (See *Keeler* v. *Superior Court* (1956) 46 Cal.2d 596, 600 [297 P.2d 967].) This doctrine, however, does not apply to the present case. This is not a case in which an agency rendered ambiguous findings concerning the environmental effect of the project, but a case of total absence of any written determination on the matter; for all the record reveals, the council may have simply ignored CEQA and enacted the ordinances in the same manner to which it was accustomed before CEQA was enacted. [Fn. omitted.]

"At the time of the January 8, 1973, resolution, the council had already approved the project. No resolution adopted on that date can

constitute that determination of environmental impact prior to approval of the project which the act requires. The resolution adopted at that meeting represents simply an example of that '*post hoc* rationalization' of a decision already made, which the courts condemned in *Citizens to Preserve Overton Park* v. *Volpe* (1971) 401 U.S. 402, 420 [28 L.Ed.2d 136, 155, 91 S.Ct. 814] and *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist.* (1972) 27 Cal.App.3d 695, 706 [104 Cal.Rptr. 197]." (13 Cal.3d at p. 81.)

The Court thus made it clear that no determination made after the approval of the project can retroactively validate such approval. The conclusion is, therefore, inescapable that reenactment of the ordinances subsequent to their having been set aside pursuant to the decision can have no retroactive effect. The argument made by defendant Occidental that the decision did not hold the ordinances void *ab initio* is clearly without merit.

██ *The Judgment Is Subject to Reversal on the Basis of the Decision in* No Oil, Inc.

Defendants argue that even if Occidental's drilling activities on January 31, 1973, were unlawful as a result of the decision in *No Oil, Inc.*, the superior court decision cannot be reversed on that ground, despite the further fact that such judgment was expressly based upon the conclusion that "[t]he construction performed that day was substantial *and lawful* and performed in good faith." (Italics added.) Three separate propositions are urged in support of this position.

Defendants' primary claim is that no issue as to the lawfulness of this activity "could have been properly raised below for it would have constituted an improper collateral attack." As authority for this assertion defendants cite 22 Cal.Jur.2d 653 as follows: "A franchise is not subject to collateral attack for irregularities in the proceedings by which it was granted or for mere error in the exercise of the authority to make the grant. Where the action taken in granting a franchise is purely legislative, its correctness cannot be reviewed on certiorari. [Fns. omitted.]" Defendants also list *Gurtz* v. *City of San Bruno* (1935) 8 Cal.App.2d 399 [48 P.2d 142], *T. & T. T. Road Co.* v. *Campbell* (1872) 44 Cal. 89, *Waugh* v. *Chauncey* (1859) 13 Cal. 11, and *Norris* v. *The Farmers' and Teamsters' Co.* (1856) 6 Cal. 590, as authorities cited by California Jurisprudence.

There are several reasons why the rule relied upon by defendants has no application in this case.

The collateral attacks involved in the authorities cited all were made "by a private person," as noted in the opinion in *Gurtz* v. *City of San Bruno, supra,* at page 401, quoting in that respect from *T. & T. T. Road Co.* v. *Campbell, supra.* The validity of the ordinances in this case is not being attacked by private persons in their capacity as such. Intervening plaintiffs are public agencies charged with enforcement of the Coastal Initiative and even plaintiffs are properly acting as private attorneys general to enforce public interests which said law seeks to protect.[5]

Moreover, the rule applies only to "irregularities in the proceedings" or "mere error in the exercise of the authority to make the grant." A failure to comply with the requirements of CEQA is not such a defect; it is more in the nature of a lack of jurisdiction to act except in a particular fashion.[6]

In any event the attack upon the validity of the ordinances here involved was not a collateral attack. It was a direct attack made in the CEQA litigation to which the enacting authority, the City of Los Angeles, was a party. The result of that attack was an essential fact necessary to any disposition of this case in favor of defendants (though the case might be decided against defendants even if the ordinances were upheld). The trial court, therefore, could not dispose of this litigation favorably to defendants unless and until this question was resolved in favor of the validity of the ordinances.

The proper way for the court to have proceeded under those circumstances was by the entry of a conditional judgment. Having found

---

[5]Section 27425 of the code expressly so provides: "Any person may maintain an action for declaratory and equitable relief to restrain violation of this division. No bond shall be required for an action under this section." (Cf. *Bozung* v. *Local Agency Formation Com.,* 13 Cal.3d 263, 272 [118 Cal.Rptr. 249, 529 P.2d 1017], upholding such standing under CEQA.)

[6]In *People* ex rel. *Dept. Pub. Wks.* v. *Bosio,* 47 Cal.App.3d 495 [121 Cal.Rptr. 375], we had occasion to comment upon a statement contained in the opinion in *Centerview/Glen Avalon Homeowners Ass'n* v. *Brinegar* (C.D.Cal. 1973) 367 F.Supp. 633, 640, that "the provisions of the statutes sought to be enforced are procedural in nature" (referring to the environmental impact statement requirements of the National Environmental Policy Act and to the Federal Aid Highway Act). There we said: "Whether or not the court's assessment of the environmental impact statement requirement of NEPA is correct under federal case law (which seems highly questionable), it certainly does not reflect the view of the courts of this state with respect to the EIR requirement imposed by CEQA." (47 Cal.App.3d at p. 528.)

that defendant Occidental had performed substantial construction in reliance upon the drilling district ordinances and permits issued pursuant thereto, it could properly (1) have declared that a permit pursuant to the provisions of section 27400 of the Code was not required, provided the final decision in *No Oil, Inc.* held such ordinances to have been validly enacted, and in the alternative (2) have declared that in the event such ordinances were invalidated, but later reenacted, the permit requirement of section 27400 would be applicable. In a similar situation this court approved such a conditional judgment in *Chandler* v. *Hibberd,* 165 Cal.App.2d 39, 50-51 [332 P.2d 133]. The court said: "The legal priorities [*sic*] between an agreed boundary and the original surveyed boundary line is one that permits the use of an alternative or contingent judgment. The agreed boundary is controlling if the judgment establishing it becomes final, otherwise a determination of the original boundary line is required. The use of the alternative or contingent form of judgment is proper under such circumstances. A judgment in this form has the practical advantage of eliminating subsequent litigation as to the location of the true boundary in the event, as here, the findings relative to an agreed boundary are not sustained. Such disposition of a cause has been sanctioned in this state. (*Henigson* v. *Bank of America,* 32 Cal.2d 240, 243-245 [195 P.2d 777]; *Fageol T. & C. Co.* v. *Pacific Indem. Co.,* 18 Cal.2d 748, 753-754 [117 P.2d 669].) In the *Henigson* case the court reviewed an alternative judgment, found the basic premise of the judgment to be erroneous and proceeded to consider the alternative determination (p. 245). (See also 28 Cal.Jur.2d, § 69, p. 704; 30A Am.Jur., § 120, p. 239; *Peterson* v. *Overson,* 52 Ariz. 203 [79 P.2d 958, 959]; *Donaldson* v. *Greenwood,* 40 Wn.2d 238 [242 P.2d 1038, 1046]; *Black* v. *Burd* (Tex.Civ.App.) 255 S.W.2d 553, 557.)"

Thus, though the validity of the three drilling district ordinances could not have been determined in the court below, the judgment could and should have provided for the contingency that the granting of the hearing might result in a reversal of the trial court's decision in *No Oil, Inc.* Such disposition of the matter would not have entailed any collateral attack.

Likewise untenable is defendants' contention that consideration of the effect of the Supreme Court decision in *No Oil, Inc.* is foreclosed by the "general rule of appellate review that questions not raised in the trial court will not be considered on appeal." (5 Cal.Jur.3d 117.)

The record below does not contain a clear specification of plaintiffs' present position. It indicates, however, that the impact of possible reversal in *No Oil, Inc.* was fully comprehended by both counsel and the court. Counsel for intervening plaintiffs asserted that "absent the drilling ordinances" Occidental had "no business with their rig on this property" and was apparently in the process of stating the effect of a reversal by the Supreme Court when he was interrupted by the court's comment that it had "enough trouble with the coastal zoning matter." The court indicated its understanding that the drilling ordinances were a "necessary step" to the lawfulness of Occidental's drilling operation. It is fair to say, therefore, that the point was fully understood in the court below except that the court did not appreciate the availability of a contingent judgment to deal with the matter.

Furthermore, the general rule has no application where the point first raised on appeal involves a matter of significant public policy or public interest. "The general rule precluding the raising of questions for the first time on appeal is subject to exception where fundamental error or gross irregularity is involved. . . . Also, matters involving public policy, such as an action to enforce an illegal contract or recover compensation therefrom, or matters involving the public interest, such as application of the rule against perpetuities, have been reviewed by the appellate court even though such matters were not presented to the trial court. [Fns. omitted.]" (5 Cal.Jur.3d 119-120.)

In *Wong* v. *Di Grazia,* 60 Cal.2d 525, 532, footnote 9 [35 Cal.Rptr. 241, 386 P.2d 817], the court considered and disposed of an issue as to the effect of the rule against perpetuities which was not raised in the trial court. Concerning the effect of the parties' failure to raise the point below, the court said: "The rule against perpetuities issue was first brought to the attention of the parties by a question during the oral argument before the District Court of Appeal. (See *Wong* v. *Di Grazia* (Cal.App.) 29 Cal.Rptr. 86, 88.) Defendants contend that the issue not having been raised at trial, it was improper for the District Court of Appeal, and would be improper for this court, to adjudicate that issue. We doubt the validity of this contention; in any event, the issue as to the rule against perpetuities of is [*sic*] considerable public interest; it has been fully argued before this court; we, accordingly, dispose of the issue on its merits."

In *Claremont Imp. Club.* v. *Buckingham,* 89 Cal.App.2d 32, 33 [200 P.2d 47], a restrictive covenant limiting residential occupancy to those of

"pure Caucasian blood" was upheld in the trial court over the objection that it was "incapable of certain definition or determination." "Pending the appeal the Supreme Court ruled in *Cumings* v. *Hokr,* 31 Cal.2d 844 [193 P.2d 742], on authority of decisions of the United States Supreme Court that such covenants were unenforcible in the courts of this state. Appellants thereupon filed a brief attacking the constitutionality of the covenant on the authority of the *Cumings* case. Respondents now contend that it is too late to raise the issue on this appeal. It is true that appellants mentioned the matter of constitutionality casually at the trial, but it is also true that they did not raise the issue properly and did not ask for a ruling on it." Nonetheless the court reversed the judgment below on the basis of the *Cumings* case. It said in this respect: "Ordinarily when a question is raised for the first time on appeal it will not be accepted as proper grounds for a reversal of the trial court's judgment since that court was not given an opportunity to rule on it. But an adherence to that practice would not be justified in this case. The question of the constitutionality of such restrictive covenants has been a matter of judicial controversy for more than 50 years. If the Supreme Court had determined it prior to the trial of this case judgment for the defendants would have followed necessarily."

Both CEQA and the Coastal Initiative implement public policy of the highest priority.[7] Thus, even if the point was not adequately presented below, this court must apply the policies of these two important laws to the correct resolution of this appeal.

The additional claim that the judgment below may not be reversed on account of "matters occurring after the entry of judgment" is inapposite. This is apparent from the case cited to support it. *People's Home Sav. Bank* v. *Sadler,* 1 Cal.App. 189, 193 [81 P. 1029], stands only for the principle that the correctness of a judgment is determined as of the date of its rendition and is unaffected by subsequent events which do not demonstrate the impropriety of the judgment as rendered. A judgment rendered against a shareholder during his lifetime for the unpaid portion of his subscription for stock was held not subject to reversal on appeal by

---

[7]Referring to CEQA our Supreme Court said in *Friends of Mammoth* v. *Board of Supervisors,* 8 Cal.3d 247, 255 [104 Cal.Rptr. 761, 502 P.2d 1049]: "In an era of commercial and industrial expansion in which the environment has been repeatedly violated by those who are oblivious to the ecological well-being of society, the significance of this legislative act cannot be understated." Section 27001 of the code contains the following statement of policy: "that the permanent protection of the remaining natural and scenic resources of the coastal zone is a paramount concern to present and future residents of the state and nation."

virtue of the plaintiff's failure to present a claim against the shareholder's estate. Having been valid when entered, the judgment was not subject to attack on account of any subsequent event. The trial court's judgment herein, however, was erroneous when entered.

### *Disposition*

The foregoing requires reversal of the judgment and the entry of a judgment in favor of plaintiffs and intervening plaintiffs (1) enjoining any further drilling by Occidental without first obtaining a permit pursuant to section 27400 of the code and (2) declaring that such a permit is required in the event the drilling district ordinances are reenacted or the City of Los Angeles otherwise authorizes drilling within the permit area.

In view of this result plaintiffs and intervening plaintiffs are, of course, entitled to an award of attorneys' fees. No objection has been made to the sufficiency of the evidence to support the trial court's findings as to the reasonable value of the services rendered. Such findings, however, relate only to the services of the attorneys in the conduct of the case up to the time of judgment. A further determination must be made with respect to the reasonable fees for the conduct of this appeal. There is no record before this court on the basis of which any such determination can be made, and it is therefore necessary to remand the matter to the trial court for the purpose of making such determination.

We note further that the judgment of the trial court makes no allocation as between the parties liable to pay fees of the prevailing parties and simply provides for their liability "jointly and severally." Such disposition of the matter, now that fees are to be awarded against defendants, seems inappropriate in light of the disparity between the contribution of defendant Occidental to the necessity for and the burden of the litigation in relation to that of defendant Landowners Association.[8] The latter was not responsible for the threatened drilling which occasioned this lawsuit and its participation in the litigation contributed

---

[8]In *Wilderness Society* v. *Morton*, (1974) 495 F.2d 1026 [161 App.D.C. 446] the court determined that a pipeline company, which intervened as a defendant, should bear one-half of the fees awarded plaintiff on the ground it "unquestionably was a major and real party at interest in this case, actively participating in the litigation along with the Government" (p. 1036). The United States Supreme Court has since determined that it was improper to have awarded plaintiff any fees, but did not deal with the question how they should be apportioned if payable. (*Alyeska Pipeline Service Co.* v. *Wilderness Society* (1975) 421 U.S. 240 [44 L.Ed.2d 141, 95 S.Ct. 1612].)

little to the cost of representation of plaintiffs.[9] No substantial new contentions were injected by such defendant and its participation in the trial was for the most part that of an observer. The court should therefore make a fair allocation of the responsibility as between these defendants for payment of the fees awarded plaintiffs.

■ There remains the question whether and to what extent civil fines or penalties pursuant to sections 27500 and 27501 of the code should be imposed in this case.[10] In its supplemental brief defendant Occidental asserts that imposition of any such fines on account of work "performed in good faith reliance" on the drilling district ordinances would be improper. Under the particular facts of this case, we are inclined to agree.

The exactions authorized by sections 27500 and 27501 of the code clearly are penalties. They are expressly referred to as such in section 27426, which provides: "Any person may maintain an action for the recovery of civil penalties provided in sections 27500 and 27501."

"Penalties are never favored by courts of law or equity and statutes imposing penalties or creating forfeitures must be strictly construed. (*Askew v. Ebberts*, 22 Cal. 263; *Schallert-Ganahl L. Co. v. Neal*, 91 Cal. 362 [27 P. 743]; *Eyre v. Harmon*, 92 Cal. 580 [28 P. 779].) Every intendment and presumption is against the person seeking to enforce the penalty or forfeiture provided by such a statute. (*Irvine v. McKeon*, 23 Cal. 472.)" (*Savings and Loan Society v. McKoon*, 120 Cal. 177, 179 [52 P. 305].) As stated in *People v. One 1939 Plymouth 6 Coupe*, 41 Cal.App.2d 559, 562 [107 P.2d 266]: "The courts will usually give such a construction to statutes providing for forfeiture as will be consistent with justice and the dictates of natural reason."

The court found (finding No. 30) that the construction activities of defendant Occidental which were in violation of section 27400 of the code were performed "in the ordinary course of business and in good faith" and (finding No. 31) that none of such work would have been

---

[9]Apparently the only time charged by plaintiffs' attorneys specifically attributable to defendant Landowners Association's intervention was 13 hours charged by counsel for intervening plaintiff Coastal Commissions in opposing the intervention.

[10]"Any person who violates any provision of this division shall be subject to a civil fine not to exceed ten thousand dollars ($10.000)." (§ 27500.)

"In addition to any other penalties, any person who performs any development in violation of this division shall be subject to a civil fine not to exceed five hundred dollars ($500) per day for each day in which such violation persists." (§ 27501.)

performed "had the three drilling ordinances . . . not been passed and signed."

In *St. John the Bapt. Sch. Bd.* v. *Marbury-Pattillo C. Co.* (La.App. 1970) 239 So.2d 387, 393, the court said: "Courts are loath to impose statutory penalties and will refrain from doing so where there is evidence of good faith and a substantial effort of a party to perform its obligations in an expeditious, proper and equitable manner."[11]

Though we are not prepared to say that unfounded good faith belief that conduct constituting a violation of the Coastal Initiative is lawful constitutes a defense to the penalties provided by sections 27500 and 27501, we do hold that such good faith belief reasonably entertained is a defense. The policy of strict construction against imposition of penalties and the canon that the construction given such a statute shall "be consistent with justice and the dictates of natural reason" require that sections 27500 and 27501 of the code be construed as calling for a substantial element of culpability.

In the present case defendant Occidental has been found by the court to have manifested no such culpability. Substantial evidence supports the court's finding of Occidental's good faith reliance upon the drilling district ordinances, and the undisputed facts establish the reasonableness of that reliance. At the time it performed the construction upon which the imposition of a penalty could be based, Occidental had successfully maintained in the trial court the validity of the drilling district ordinances essential to its operation.[12] The City of Los Angeles, acting upon such determination, had issued a specific permit for the conduct of such operations. Occidental was confronted with a deadline of February 1, 1973, which if not met would result in the imposition of a further onerous permit requirement. The time crisis created by that deadline was due in large part to the maintenance of the CEQA litigation attacking the drilling district ordinances initiated by Occidental's opposition.

Under all the circumstances it was not so unreasonable for defendant Occidental to attempt to preserve its position under the drilling

---

[11]Although the result in this case was modified by the Louisiana Supreme Court, which imposed the penalties, the ground was that "[g]ood faith and substantial effort to comply were matters of defense that . . . were not timely raised . . . ." (*St. John the Baptist P. S. B.* v. *Marbury-Pattillo C. Co.* (1971) 259 La. 1133 [254 So.2d 607, 611].)

[12]Moreover, our Supreme Court invalidated the drilling district ordinances by a bare majority of four to three.

ordinances by initiating drilling operations thereunder, though it could not by such conduct acquire the right to proceed without obtaining a permit pursuant to section 27400 of the code unless its position were ultimately upheld in our Supreme Court. While Occidental was chargeable with knowledge that its conduct might ultimately be held to be unlawful, it was not culpable to a degree justifying the imposition of a penalty.

The judgment is reversed and the cause remanded for further proceedings in accordance with the views expressed above.

Ford, P. J., and Cobey, J., concurred.

A petition for a rehearing was denied August 8, 1975.