[L.A. No. 30142. In Bank. Aug. 22, 1973.]

SAN DIEGO COAST REGIONAL COMMISSION FOR SAN DIEGO COUNTY, Plaintiff and Appellant, v.
SEE THE SEA, LIMITED, Defendant and Respondent.

## COUNSEL

Evelle J. Younger, Attorney General, Carl Boronkay, Assistant Attorney General, and Dennis A. Antenore, Deputy Attorney General, for Plaintiff and Appellant.

Hillyer & Irwin, Oscar F. Irwin and Brown B. Smith for Defendant and Respondent.

Ball, Hunt, Hart, Brown & Baerwitz, George A. Hart, Jr., John R. McDonough, Acret & Perrochet, James M. Baratta, James Acret, Pollock, Williams & Berwanger, John P. Pollock, Charles V. Berwanger, Cox, Castle, Nicholson & Weekes, George M. Cox, Phillip R. Nicholson and Richard D. Norton as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

CLARK, J.—Appeal from order denying preliminary injunction. (Code Civ. Proc., § 904.1, subd. (f).)

Defendant owns land within 1,000 yards of the California coastline. Having planned to develop the property since 1968, it applied to the City of San Diego for a building permit in July 1972, for construction of a condominium project.

The permit was granted on 6 December 1972. In the first week of January 1973, defendant demolished a motel on the site and, prior to 1 February, spent $79,000 in construction, also incurring finance charges.

Construction progressed to 2 March 1973 when plaintiff, a regional commission operating pursuant to the California Coastal Zone Conservation Act of 1972 (Pub. Resources Code, § 27000 et seq.;[1] hereinafter "act"), commenced this action to impose civil fines[2] and to halt further development on the ground defendant lacked a coastal permit. A temporary restraining order issued by the trial court was subsequently dissolved and a preliminary injunction denied. The court found that prior to 1, February 1973 defendant had obtained a vested right to complete the development because it had relied in good faith on the city's building permit, and that a coastal permit therefore was not required. Plaintiff appeals.

■ We have concluded the act requires a coastal permit for construction commenced after 1 February 1973, but does not require one for builders performing substantial lawful construction of their projects prior thereto.

The act, adopted as an initiative measure (Proposition 20) at the 7 November 1972 general election, has the stated purposes of permanently protecting and restoring the natural and scenic resources of the coastal zone. (§ 27001.)

The act provides that a permit from a regional commission shall be required for developments on land within 1,000 yards of the mean high tide line (called the "permit area") (§§ 27001, subd. (c), 27104, 27400) to assure coastal development consistent with certain environmental objectives (§§ 27402, 27403, 27001, 27302).

Section 27400 provides: "On or *after February 1, 1973, any person wishing to perform any development* within the permit area shall obtain a permit authorizing such development from the regional commission and, if required by law, from any city, county, state, regional or local agency." (Italics added.)

---

[1] Unless otherwise stated, all references are to the Public Resources Code.

[2] Persons who violate the act are subject to civil fines of up to $10,000 and, in addition, persons who perform any development in violation of the act are subject to civil fines not to exceed $500 per day. (§§ 27500, 27501.)

Section 27404 provided at the time the act was passed: "If, prior to the *effective date of this division,* any city or county has issued a building permit, no person who has obtained a vested right thereunder shall be required to secure a permit from the regional commission; . . . Any such person shall be deemed to have such vested rights if, prior to April 1, 1972, he has in good faith and in reliance upon the building permit diligently commenced construction and performed substantial work on the development and incurred substantial liabilities for work and materials necessary therefor."[3] (Italics added.)

The ballot pamphlet furnished voters respecting Proposition 20 contained the Detailed Analysis by the Legislative Counsel stating: "4. Beginning February 1, 1973, [the act would] require a permit from a regional commission for any *proposed* development (with specified exemptions) within the 'permit area,' . . . ." (Italics added.) The ballot pamphlet also contained the Argument in Favor of Proposition 20, jointly authored by a United States Senator, a State Senator, and the Speaker of the Assembly, which stated: "THE SAFEGUARDS: (1) *This act will not impose a moratorium* or prohibit any particular kind of building, but ensures that authorized construction will have no substantial adverse environmental effect[.]" (Italics added in part.)

In imposing the permit requirement on "any person *wishing* to perform any development" on or after 1 February 1973, the language of section 27400 is directed at persons who have not commenced construction on the operative date, and it is conceded by plaintiff that construction could lawfully commence prior to that date without a coastal permit. Nowhere does the act expressly provide for a moratorium on construction commenced prior to 1 February 1973. Reference having been omitted to a moratorium and to work commenced but uncompleted on 1 February, the plain implication of the prospective language used is that the coastal permit requirement would be inapplicable to such projects.

Legislative Counsel's analysis set forth in the voters' pamphlet reinforces this conclusion by having stated a coastal permit would be required for "proposed" developments beginning 1 February. Further, the ballot argument of the act's proponents expressly stated the act would not impose a moratorium.

---

[3]The latter section was amended by the Legislature on 19 April 1973, after the events involved in the present case, to substitute "November 8, 1972" for "the effective date of this division," and "November 8" for "April 1." The amendment also provides: "It is not the intent of the Legislature, in enacting the provisions of this act, to affect any right which might otherwise vest or has vested under the law."

Had the act been intended to require a permit for completion of construction commenced before 1 February, the requirement would as a practical matter have resulted in a moratorium on all construction in the permit area. The built-in delays incident to the issuance of permits, which could exceed seven months (§§ 27420, 27423), would have necessitated work stoppages for all development along the California coastline after 1 February 1973 for a significant period[4] (except the rare uncompleted projects commenced prior to 1 April 1972). Such interference with construction in progress, tantamount to a moratorium, would result in serious economic dislocations not contemplated by the act, its authors, or the voters.

Therefore, in the absence of language in the act imposing a moratorium, it is reasonable to conclude the voters intended none.

It should here be added that the Legislative Counsel, by opinion rendered nearly two months prior to passage of the act, concluded that a person who, prior to 1 February 1973, in good faith lawfully commenced construction, performed substantial work, and incurred substantial liabilities would be allowed to complete the development without a coastal permit.

Relying on provisions of section 27404 set forth above that no permit is required of certain persons who have commenced construction, plaintiff urges the section thus means all others must obtain permits. It is only by negative implication from this section that such a class can be defined. While providing for exemption, the section does not expressly impose a permit requirement on anyone. The prospective language used in section 27400 and in the Detailed Analysis of the Legislative Counsel, the proponents' express denial of intent to impose a moratorium, and the absence of express statutory provision for a moratorium again lead us to conclude the permit requirement should not be expanded by negative implication to construction commenced before 1 February 1973.

Plaintiff suggests that if, as we have concluded, the permit requirement is inapplicable to persons performing substantial work prior to 1 February 1973, the exemption provision of section 27404 will be rendered meaningless because persons satisfying that provision would in any event be exempt.

---

[4]The act contemplates the commission shall prescribe the procedures for permit applications (see § 27420), and the commission's first meeting will be about 15 February 1973 (§ 27225). Twenty-one days must elapse before there may be a hearing on an application for a permit. (§ 27420.) Thus, if the permit requirement were applicable to lawful construction in progress on 1 February 1973, the act would contemplate stoppages of more than one month as a minimum, including stoppages of projects which are in accordance with the objectives of the act.

However, the argument misconstrues section 27404. Although that section provides exemption for some not coming within the permit requirement, it also exempts some who do; for example, those who acted in reliance on a building permit obtained prior to the effective date of the act,[5] and demolished structures or incurred substantial expenses and liabilities preparatory to construction.

Finally, it would be unjust now to imply a permit requirement for builders who, like defendant, relied on the absence of an express requirement. Even though a particular construction project might actually conform to the act's objectives, construction would have to be interrupted while a permit is sought. These interruptions would obviously result in large losses for builders who performed substantial lawful work prior to 1 February 1973. The result is particularly unwarranted in light of the ease with which the authors of the act could have expressed their intent to require an earlier operative date for the permit. To impose the requirement now by negative implication would simultaneously create and spring a trap, resulting in economic chaos in California's construction industry.[6]

The mere acquisition of a building permit prior to 1 February 1973 does not give the holder freedom to proceed without commission authorization. ▮ Here, however, there is overwhelming evidence that defendant prior to that date not only obtained a building permit but also engaged in substantial lawful work and incurred substantial liabilities. Under the circumstances, we must uphold the trial court's discretion in denying preliminary injunction.[7]

The order granting writ of supersedeas is vacated forthwith. The order appealed from is affirmed.

McComb, J., Burke, J., and Sullivan, J., concurred.

---

[5]The effective date of the act was 8 November 1972. (Cal. Const., art. VI, § 24.)

[6]Although the act does not expressly require good faith effort toward completion of the project to be made prior to 1 February 1973, it appears obvious that plans for any substantial project commenced prior to that date had to be formulated long before because of the time-consuming procedures inherent in securing a building permit from a city or county, including the environmental impact report essential for any project which may have a significant effect on the environment. (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 271-272 [104 Cal.Rptr. 761, 502 P.2d 1049].) There is no reason to suppose that any developers after passage of Proposition 20 could (or would in a bad faith attempt to take advantage of the delayed coastal permit requirement) formulate plans thereafter for substantial projects, secure the necessary engineering and architectural plans, obtain their approval by governmental agencies, and perform substantial work prior to 1 February.

[7]The conclusion makes it unnecessary at this time to consider the several constitutional issues raised by defendants and amici curiae.

**MOSK, J.**—The majority opinion sanctions a construction of the California Coastal Zone Conservation Act which is contrary to the plain language of section 27400 thereof, virtually disregards the provisions of section 27404, and violates settled principles of law. The opinion holds that a permit from the commission is required only for construction commenced after February 1, 1973, and that no permit is necessary if substantial construction was lawfully commenced prior to that date.

The rule long established in this state and in most other jurisdictions is that the mere acquisition of a building permit affords a builder no protection against a change in the zoning laws adopted after its issuance and that, in order to continue the construction of a project initiated prior to a change in the law, a builder must have obtained a vested right by making substantial expenditures for construction in good faith reliance on the permit prior to the effective date of the new law. (See, e.g., *Brougher* v. *Board of Public Works* (1928) 205 Cal. 426, 432 et seq. [271 P. 487]; *County of San Diego* v. *McClurken* (1951) 37 Cal.2d 683, 691 [234 P.2d 972]; *Russian Hill Improvement Assn.* v. *Board of Permit Appeals* (1967) 66 Cal.2d 34, 39 [56 Cal.Rptr. 672, 423 P.2d 824]; *Spindler Realty Corp.* v. *Monning* (1966) 243 Cal.App.2d 255, 263 [53 Cal.Rptr. 7]; *Anderson* v. *City Council* (1964) 229 Cal.App.2d 79, 89 [40 Cal.Rptr. 41]; *Trans-Oceanic Oil Corp.* v. *Santa Barbara* (1948) 85 Cal.App.2d 776, 784 et seq. [194 P.2d 148]; 101 C.J.S., Zoning, § 243; 58 Am.Jur., Zoning, § 185; 8 McQuillin, Municipal Corporations (3d ed. 1965) § 25.157.) Although the foregoing cases generally involve a change in the zoning law which thereafter prohibited a use previously permitted, the same principle is applicable where, as here, a further requirement is imposed by change in the law, i.e., the need for an additional permit from the commission.

The majority do not expressly require the acquisition of vested rights in order to qualify for an exemption from a commission permit but, rather, for reasons unexplained, they adopt only the first part of the rule set forth above, i.e., that the mere acquisition of a building permit is not sufficient to allow a builder to proceed without commission authorization and then they apply half of the requirements of the rule, i.e., that substantial construction is required for an exemption. If, as the majority hold, a commission permit is required only for construction *commenced* after February 1, what justification can there be for insisting that pre-February construction be substantial in character in order to qualify for an exemption? Inexplicably the majority merely rely on a truncated version of the vested rights concept and apply half of its basic requirements, without mentioning vested rights, and in support of their abbreviated rule cite no section of the act and no case law.

As to the second prong of the test under the vested rights rule, i.e., good faith, the majority declare that the act does not require a good faith effort to complete construction before February 1[1] but that nevertheless all builders who obtained a permit after November 8 must have been in good faith since of necessity prior to issuance of the permit they formulated plans and expended funds thereon. What the settled rule requires, however, as the authorities above make clear, is that good faith expenditures for construction be made *in reliance on a building permit*. The majority relate pre-permit expenditures as the *sine qua non* of good faith without any citation of authority and, indeed, contrary to all the prevailing authorities cited above.[2]

The result of the majority's holding is that a builder who obtained a local permit on January 31 or a few days prior thereto and managed to perform substantial work before February 1 for the admitted purpose of "beating" the deadline nevertheless shall be deemed to be in good faith as a matter of law on the theory that he must have made substantial expenditures on construction plans, etc., prior to that date. And this becomes the rule even though the construction occurred after the effective date of the act, which admittedly is November 8.

That such dismal prospect is not mere hyperbole appears from an analysis submitted by amicus curiae. According to the study, 17 projects within the jurisdiction of the regional commission involved in this proceeding and the state commission would or could be affected by "a change in the effective date of the act."[3] Of these seventeen, seven builders received their local building permits within two weeks of February 1, two of these on January 30, and one on January 31. The developer who received the local permit on January 31, for a 100-unit condominium, hastily poured part of the foundation that very day, thereby qualifying for a complete exemption under the theory of the majority. The 17 projects total almost 2,700 units, including one project for 620 units and one for 520 units.

The majority rely initially on the language of section 27400. The section

---

[1] The act does not expressly require substantial construction before February 1, but this omission does not deter the majority from holding that substantial construction is a requirement for an exemption. The only relevance of substantial work is in the context of vested rights.

[2] It is interesting to note that the opinion of the Legislative Counsel, upon which the majority heavily rely, states that a builder must meet both prongs of the vested rights rule in order to be exempt from a commission permit. It is also noteworthy that the opinion merely speculated upon what a court would do when faced with the problem of pre-February construction. The opinion of the Attorney General is directly contrary to that of the Legislative Counsel. (56 Ops.Cal.Atty.Gen. 72.)

[3] Amicus suggests 26 or 30 projects would be affected statewide.

provides, "On or after February 1, 1973, any person wishing to *perform* any development within the permit area shall obtain a permit authorizing such development from the regional commission . . . ." (Italics added.) The majority construe the word "perform" in section 27400 as "commence."[4] However, the primary dictionary definition of the word "perform" is to the contrary. The initial relevant definition of that term is "bring to a finished state: Complete" (Webster's Third New Internat. Dict. (1961) p. 1678) or "To carry on to the finish; to complete or accomplish" (Webster's New Internat. Dict. (2d ed. 1934) p. 1818) or "to act on so as to accomplish or bring to completion" (2 Webster's New World Dict. (1951) p. 1084). The only other rendition of the word "perform" in the context of the statute is "to carry out or bring about: Accomplish, Execute." (Webster's Third New Internat. Dict. (1961) p. 1678.) The plain meaning of the section is that "[O]n or after February 1, 1973, any person wishing to [*complete or carry out*] any development within the permit area shall obtain a permit . . . ." Thus, although the majority purport to employ the language of section 27400, their construction of the word "perform" as being synonymous with "commence" distorts the meaning of the section.

The second major premise of the majority is that the permit requirement should apply only to builders who commence construction after February 1 because the legislation imposed no express moratorium on building and as a practical matter a moratorium would have resulted if a permit was required for the completion of construction commenced prior to February 1. This contention is unpersuasive. First, although no moratorium was imposed by the act either as to the period between November and February or the post-February period, the absence of such a moratorium was not intended to benefit those who obtained permits and began construction after November 8. Second, if a permit from the commission was required as to building commenced after November 8 this requirement would not have resulted in a moratorium on construction.

As to the post-February period, it is obvious that no moratorium was intended since a substantial portion of the act is devoted to the conditions under which building permits are to be issued by the commission after that date. The majority opinion relies upon the statement of the proponents of the act in the ballot pamphlet that no moratorium is to be imposed by the act and implies that thereby the voters intended to except from the permit requirement builders who commenced construction after November

---

[4]The majority opinion declares that "the act requires a coastal permit for construction *commenced* after February 1." (Italics added.)

8 but before February 1. However, the statement in the pamphlet, when viewed in context, shows clearly that the reference to the absence of a moratorium applied only to the post-February period and not to the period between November 8 and February 1.[5]

With reference to the period between November 8 and February 1, neither the act nor the ballot arguments mention a moratorium. Nevertheless, since there was no express prohibition against construction between those dates, the majority are correct in their statement that there was in fact no moratorium in existence during that period. The majority's deduction does not follow, however, that if it were the intent of the act to require a permit for completion of construction commenced before February 1, "the requirement would as a practical matter have resulted in a moratorium on all construction in the permit area." The fact is that in the period between November 8 and February 1, a significant number of developers were entitled to continue the construction of projects commenced prior to November 8 as to which local permits had been obtained and substantial construction had occurred prior to that date. These developers had obtained a vested right entitling them to complete their projects after November 8, and no valid reason existed to prohibit them from doing so. The absence of a moratorium during this interim period is readily explained by the desire to assure that this group of developers, numbering perhaps 300,[6] would not be delayed in the construction of their projects, which they had a compelling right to complete because they had acquired a vested right before November 8, the effective date of the act.

---

[5]The relevant sentence in the ballot argument is as follows: "This act will *not* impose a moratorium or prohibit any particular kind of building, but ensures that authorized construction will have no substantial environmental effect." The majority emphasize the first clause of this sentence. However, the use of the word "authorized" in the latter portion of the sentence must refer to projects authorized by the commission. Since the commission could not authorize construction until after February 1, it is clear that the quoted sentence means that from February 1 onward there would be no moratorium on construction.

It is noteworthy that the ballot argument by the opponents of the initiative warned that the act would impose a moratorium on virtually all construction in the coastal zone.

[6]The coastal commissions, in conformity with the advice of the Attorney General, have been interpreting the act so as to require a permit from the commission for any construction occurring after February 1 if the builder had not obtained a vested right prior to November 8. The commission has enacted regulations for the purpose of passing upon exemption claims by builders who assert that they have obtained a vested right to complete a development. As of June 1, 1973, 199 claims of exemption have been granted by the various regional commissions, and 93 claims for exemption are pending. This figure may be contrasted with the 26 or 30 developments (see fn. 3, *ante*) referred to in the study of amicus curiae as to which developers relied upon acts after November 8 for the right to complete construction without a permit from the commission.

Of course, the absence of a moratorium also permitted builders who obtained permits after November 8 to commence construction of their developments. However, as we shall discuss hereafter those builders were given notice by the provisions of section 27404 that they could not rely with certainty upon acts performed within the November to February period to qualify for a vested right, so as to exempt them from the requirement for a commission permit.

The majority raise a frightening spectre of long delays in processing applications for permits, with resultant severe economic dislocations if projects begun before February 1 were halted by the requirement for a commission permit. With no empirical data to justify their distress, the majority assert, *ipse dixit*, that if a commission permit were to be required the result would be "economic chaos in California's construction industry." As we have seen, the builders of a large majority of the projects commenced prior to February 1 were not subject to any delay in construction since they had secured a vested right to complete construction by their acts performed prior to November 8. The number of projects initiated in the November-February period total approximately 26 to 30 throughout the state (see fn. 3, *ante*). Even as to these, the seven-month delay contemplated by the majority for processing permit applications is grossly excessive. The regional commissions received 2,567 applications for permits in the four months prior to June 1, 1973. More than half of those applications had been processed by that date; only 28 applications were denied.

The most serious defect in the majority opinion lies in its misinterpretation of section 27404. The briefs of the parties are devoted largely to an exposition of the meaning of that section and its application to those builders who, like defendant, obtained a local permit and commenced construction in the November-February period. Defendant contends that it obtained a vested right to complete construction of its development because it made substantial expenditures in good faith reliance upon a local building permit prior to the effective date of the act and that the effective date of the act under section 27404 is February 1, rather than November 8. The Legislative Counsel's conclusion that builders who commenced construction in the November-February period could obtain vested rights to finish their projects after February 1 is also based upon its assumption that the effective date of the act is February 1 rather than November 8. The majority hold November 8 to be the effective date but nevertheless maintain that an exemption may be obtained by a builder who obtained a permit and commenced construction in the November-February period. This holding is contrary to the terms of section 27404. The section provides,

"If, prior to November 8, 1972, any city or county has issued a building permit, no person who has obtained a vested right thereunder shall be required to secure a permit from the regional commission; providing that no substantial changes may be made in any such development, except in accordance with the provisions of this division. Any such person shall be deemed to have such vested rights if, prior to November 8, 1972, he has in good faith and in reliance upon the building permit diligently commenced construction and performed substantial work on the development and incurred substantial liabilities for work and materials necessary therefor."[7]

The only reasonable interpretation of this provision is that persons who obtained vested rights prior to November 8 are exempt from the permit requirement, but those who did not acquire such rights prior to that date are not exempt. The concept of vested rights is based upon constitutional principles. If the act had merely contained a provision requiring a permit from the commission after February 1, any person who had acquired vested rights prior to that date would have been entitled to complete construction after February 1 under the general principle set forth in cases cited above, i.e., one who has acquired a vested right prior to a change in the zoning law cannot be deprived of the opportunity to complete his project.

Thus, the only purpose which section 27404 conceivably could serve was to assure that acts performed by a builder after November 8, such as obtaining a permit and commencing construction, could not be relied upon to establish vested rights for qualifying the builder to an exemption from the requirement that he obtain a permit from the commission.

The majority opinion seems to suggest that the purpose of section 27404 is to provide an exemption to persons who would otherwise be required to obtain a permit from the commission.[8] That is, a builder who, before November 8 only demolished structures (in contrast to actual construction) or who had incurred substantial expenses preparatory to construction (in contrast to actual building expenses) is exempted by section 27404 from the permit requirement and without the aid of the section he would not have enjoyed an exemption.

---

[7]As the majority opinion points out, the act as originally passed contained the words "prior to the effective date of this division" instead of "November 8, 1972" in the first sentence and contained the date "April 1, 1972" instead of "November 8, 1972" in the second sentence. The Legislature amended the section on April 19, 1973, so that it now reads as quoted in the body. The majority opinion concedes in footnote 5, as it must, that the effective date of the act was November 8, 1972.

[8]Although the majority opinion states that the purpose of section 27404 was also to grant an exemption to some "not coming within the permit requirement," such persons would not need section 27404 in order to obtain an exemption.

I am at a loss to comprehend how the section can be interpreted in this strained manner. There is not a word contained in its provisions which even remotely implies such an intention. The section merely relates that those who obtained vested rights before November 8 need not obtain a commission permit; the only definition of a vested right is contained in the second sentence of the section. That sentence provides the traditional definition of a vested right—i.e., good faith reliance on a building permit, diligent commencement of construction, substantial work, and the incurrence of substantial liabilities—all of which must occur prior to November 8.

The majority's version of section 27404 will likely create some grave inequities. To suggest just one not uncommon illustration: a builder who faithfully fulfilled all the requisites of section 27404 to obtain a vested right prior to November 8, but who desired to make a material change in his development after February 1 would be required by the section to establish that the change was in accordance with the provisions of the act.[9] However, an adjacent competitor who obtained a permit on January 31, or a few days prior thereto, and hastily constructed some improvements before February 1 for the admitted purpose of "beating" the February 1 deadline, would not be required to comply with the purposes of the act in any regard.

The majority have advanced no reasonable explication of the purpose of section 27404. It seems clear to me that the section was intended to prevent, within the period prior to February 1, a proliferation of projects which were inimical to the purposes of the act. It is antithetical to such a goal to interpret the section as declaring, as do the majority, that any person who succeeded in obtaining a last-minute local building permit and who hastily made improvements before February 1 in order to avoid the deadline is exempt from the requirement for a commission permit and may complete the construction of a vast project which is clearly detrimental to the purpose of the act.

"Finally," state the majority, "it would be unjust" to insist upon a permit requirement. Their concern ignores realities of the business world. Any builder who sought legal advice must have been informed that the effective date of the act was November 8, as provided by the Constitution, and as confirmed by legislative enactment so declaring, by the Governor

---

[9]After providing an exemption to persons who had obtained vested rights before November 8, section 27404 states, "providing that no substantial changes may be made in any such development, except in accordance with the provisions of this division."

of California who signed the legislative measure, and by a formal opinion of the Attorney General. Thus a reasonably prudent builder would have deferred construction for a brief few weeks and applied to the commission for a permit after February 1, unless he was deliberately attempting to "beat" the deadline. It seems inequitable to penalize the numerous persons who acted ethically and who scrupulously adhered to the purposes of the act, and to reward those few who hastily incurred obligations after November 8 for ulterior purposes.

It has often been said that the extent to which property rights must yield to the public interest involves a weighing of the private loss against the public benefit. (Cardozo, Paradoxes of Legal Science (1928) p. 5.) This balance is always difficult to achieve, but never more evidently than in the instant case. While I am firmly convinced that the act does not exempt builders in defendant's posture from the requirements of section 27404, objectivity dictates a concession that some few guileless builders may have been misled by the absence of a moratorium.

In such circumstances, a pragmatic accommodation of the pervasive interest of the public with legitimate private rights prescribes that a builder who made substantial expenditures for construction in good faith between November 8 and February 1 must apply to the commission for a permit but that the commission must issue the permit. In doing so, however, the commission should be able to impose reasonable requirements upon a builder to adhere to the purposes of the act. Such additional requirements may not be so stringent as to prohibit completion of the development but their imposition would provide assurance that gross emasculation of the act can be prevented. (Cf. Seneker, *The Legislative Response to Friends of Mammoth* (1973) 48 State Bar J. 127, 187.)[10]

It is disturbing, and perhaps significant, that the majority opinion gives only fleeting recognition to the salutary purposes of the act, and totally ignores the background serving as impetus for its enactment.

California was originally "a far-off land with the strange name" wrote Professor George R. Stewart, the distinguished historian of the West. But as California's abundance of natural riches became known throughout the developing nation, gradually "the westward-moving Americans saw the

---

[10]The article suggests in another context that where an important adverse effect on the environment would result from a project, public agencies should have the power to impose mitigating conditions or require the use of alternatives in order to minimize such effects. For a thorough study of the problem in general see Rockefeller, The Use of Land: A Citizens' Policy Guide to Urban Growth, The Task Force on Land Use and Urban Growth, Citizens' Advisory Committee on Environmental Quality (1973).

forest grow thin ahead, and soon they looked at the setting sun across treeless country." (Stewart, The California Trail (1962) pp. 3-4.)

It was inevitable that this state, no larger in dimension today than it was when admitted to statehood, but increasing in population from less than a quarter of a million to more than 20 million people in a century and two decades, would face the dilemma of growth versus environmental protection. The conflict is deep-rooted in economics and in differing philosophical approaches to elementary ecological factors.[11]

Whatever the personal predilections of individual citizens might be, the judiciary is ill-equipped to arbitrate this essentially policy controversy. Only the legislative process may be employed under these circumstances, and here the highest legislative voice was raised: an initiative passed by popular vote of the people. Thus the measure known as the California Coastal Zone Conservation Act of 1972 provides the ecological Marquis of Queensberry rules for achieving orderly disposition of the conflict between competing forces seeking to impose their particular brand of use upon our diminishing coastline resources.[12] Until the coastal commissions abuse their authority, I would leave the conflicts with those legislatively created bodies.

Section 27001 of the act declares that the coastal zone is a distinct and

---

[11]To some persons a tree appears to be a stately object of beauty reaching for the sky; to others a tree is perceived as uncut lumber. To some a sunset is seen as a God-given, though evanescent, painting in indescribably brilliant hues; to others a sunset is a brief interlude before the onset of neon illumination. To some a bay is a pacific recreational refuge from the incessant fury of the ocean, a haven for biological life; to others a bay serves as a potential site for oil drilling or a source for the discharge of effluents. To some the seashore is a healthful recreational playground, enticing children and families a substantial portion of the year in California's equable climate; others visualize the beaches as asphalt parking lots or sites for highrise residential and commercial developments.

If we had unlimited quantities of trees and bays and seashores, if our vistas for enjoyment of sunsets and mountains were so numerous that most would remain unobstructed forever, the divergent viewpoints could achieve an easy accommodation. But as we enter the final quarter of the twentieth century no mathematical inventory is required to demonstrate that our natural resources are limited. The alarming and growing scarcity of these resources produces the current confrontation between the advocates of progress through economic growth and the devotees of environmental purity.

[12]The director of the Scripps Institution of Oceanography, University of California, one of the proponents of the measure, described the act in this manner: "One great thing the coastal initiative has accomplished is to provide a forum where these questions can be discussed in a democratic, open, public way so that we can reach some solution satisfactory to the majority of us in what I would call the esthetic sense." (Dr. William A. Nierenberg, *Sea, Land and Man: Some Thoughts on California's Future* (Summer 1973) Cry Cal. J. p. 27.)

valuable natural resource belonging to all the people and constitutes a delicately balanced ecosystem and that the permanent protection of the remaining natural and scenic resources of the coastal zone is a paramount concern. In order to protect ocean resources and the ecological balance of the coastal zone, continues the section, and to prevent further deterioration, it is necessary to study the coastal zone, prepare a comprehensive plan for its orderly, long-range conservation and management, and ensure that any development in the permit area will be consistent with the objectives of the act.

In view of these lofty purposes, it is implausible to hold, as do the majority, that the electorate intended to permit builders who had not obtained vested rights prior to the effective date of the act, admittedly November 8, to construct projects inimical to those purposes. Such an interpretation is contrary to established law on the subject and contrary to the provisions of section 27404.

I would reverse the order of the trial court.

Wright, C. J., and Tobriner, J., concurred.

Appellant's petition for a rehearing was denied October 10, 1973. Wright, C. J., Tobriner, J., and Mosk, J., were of the opinion that the petition should be granted.