[No. S011689. Feb. 28, 1991.]

CITY OF WEST HOLLYWOOD, Plaintiff and Appellant, v.
BEVERLY TOWERS, INC., et al., Defendants and Respondents.

**COUNSEL**

Michael Jenkins, City Attorney, Richards, Watson & Gershon, Richards, Watson, Drefus & Gershon, Carol W. Lynch, Efrat M. Cogan and Christi Hogin for Plaintiff and Appellant.

Louise H. Renne, City Attorney (San Francisco), and Andrew W. Schwartz, Deputy City Attorney, as Amici Curiae on behalf of Plaintiff and Appellant.

McKittrick, Jackson, DeMarco & Peckenpaugh, Roger S. Greene, Resch, Polster, Alpert & Berger, Timothy D. Reuben, Alexander D. Alben, Stephen L. Jones, Michael W. Weinstock, Barry J. Glanell, Craig Mordoh, Malat, Lans & Malat, Melvin H. Malat, Turner, Gerstenfeld, Wilk & Tigerman, Larene Pyles, Howard, Rang & Chizever, Martine Safran, Abbitt & Bennett and Mark Lehman for Defendants and Respondents.

Phillip Chronis, Ronald A. Zumbrun and Timothy V. Kassouni as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

MOSK, J.—Defendants, the owners of apartment buildings in the City of West Hollywood (City), seek review of a Court of Appeal judgment ordering them to comply with a City ordinance requiring a conditional use permit for the conversion of apartments into condominiums. Defendants contend they are exempt from the ordinance because at the time it was enacted they had secured final subdivision map approval and permission from the California Department of Real Estate to sell individual units in their buildings as condominiums.

For the reasons stated below, we agree with defendants and reverse the judgment of the Court of Appeal to the effect that the owners cannot convert their buildings into condominiums until they have complied with local conversion regulations, including those adopted after they received all the necessary approvals granted under the state regulatory scheme.

The citizens of West Hollywood voted to incorporate as a separate municipality on November 29, 1984, thereby assuming land use power that had been vested in the County of Los Angeles (County). On that date, the newly created city council enacted a moratorium on conversions of rental housing until a regulatory system could be instituted; nine months later, the council adopted ordinance No. 114U (Ordinance 114U), which amended the West Hollywood zoning ordinance by adding comprehensive regulations governing the conversion of multiple family rental units into condominiums.

In addition to establishing certain design standards—e.g., storage space, off-street parking—Ordinance 114U requires that the City make certain findings of fact before a conditional use permit for conversion can be approved, for example: (1) that the conversion will not adversely affect the supply of rental housing in the City, especially low- and moderate-income housing; and (2) that the vacancy factor of rental housing units in the City

has exceeded 5 percent of the total housing inventory for a period of 90 days prior to conversion approval, unless (a) a new rental unit has been or will be added for each rental unit removed by conversion, (b) the developer will provide "inclusionary units or in-lieu fees," or (c) 80 percent of the existing tenants agree to purchase the units and no "substantial dislocation" of tenants will occur.

Prior to the City's incorporation, however, a number of apartment building owners within the City's future borders obtained tentative and final subdivision tract maps from the County to convert their existing rental units into condominiums, and, pursuant to a public report issued by the Department of Real Estate, secured approval for the sale of such condominiums. In 1986 the City filed a complaint for declaratory and injunctive relief, seeking to impose its condominium conversion regulations on the owners in this group who had not yet sold any units. The complaint alleged that 30 specific buildings with over 600 apartment units were subject to the ordinance.

The trial court denied the City's request for a preliminary injunction on the ground that defendants had (1) obtained preliminary and final tract map approval from the County, (2) recorded their final tract maps, and (3) obtained approval for the sale of the converted units from the Department of Real Estate. In reaching its decision, the trial court relied in part on *Santa Monica Pines, Ltd.* v. *Rent Control Board* (1984) 35 Cal.3d 858 [201 Cal.Rptr. 593, 679 P.2d 27] (hereafter *Santa Monica Pines*); it found *Griffin Development Co.* v. *City of Oxnard* (1985) 39 Cal.3d 256 [217 Cal.Rptr. 1, 703 P.2d 339] (hereafter *Griffin*) inapplicable to the facts of this case. Subsequently, the court sustained defendants' demurrers without leave to amend and entered an order of dismissal.

The Court of Appeal reversed with instructions to grant the preliminary injunction and overrule the demurrers. It held that defendants cannot convert their buildings into condominiums until they have complied with local conversion regulations, including those enacted *after* they obtained final tract map approval and permission to sell from the Department of Real Estate.

We granted review to decide whether defendants have a right under state law to convert their apartment units into condominiums because they complied with the state subdivision scheme.[1]

---

[1] After the trial court denied the City's request for a preliminary injunction and sustained defendants' demurrers to the City's complaint, but before the Court of Appeal reversed the judgment, a number of the original defendants sold individual units in their buildings as condominiums. The Court of Appeal, while holding that the absence of a preliminary injunction

## I

■ To accomplish a condominium conversion, an apartment building owner must comply with numerous government regulations. The owner must conform the conversion to the requirements of the Subdivision Map Act (Gov. Code, § 66410 et seq.) (Map Act),[2] which regulates the design, improvement and sale of subdivisions and authorizes conditions for approval of subdivision maps, and the Davis-Stirling Common Interest Development Act (Civ. Code, § 1350 et seq.), which establishes a uniform set of laws applicable to common interest developments. In addition, the sale of five or more condominiums requires a public report from the Department of Real Estate pursuant to the Subdivided Lands Act (Bus. & Prof. Code, §§ 11000-11200).[3]

Further, as this court recognized in *Griffin, supra,* 39 Cal.3d at page 256, the Map Act does not evince a legislative intent to occupy the entire field of condominium regulation. In fact, the Map Act is an enabling statute, vesting local governments with control over the design (§ 66418) and improvement (§ 66419) of land subdivisions in California. (§ 66411; see also Wenig & Schulz, *Government Regulation of Condominium in California* (1963) 14 Hastings L.J. 222, 225.) An owner must, as defendants did here, obtain approval of and record a subdivision map with the governing local entity before the owner may convert its apartment units. (*Bright* v. *Board of Supervisors* (1977) 66 Cal.App.3d 191, 193 [135 Cal.Rptr. 758]; 61 Ops.Cal. Atty.Gen. 299, 301 (1978).)

■ Having established the prerequisites to condominium conversion, we must decide whether the City can impose additional conditions on defendants' right to convert even after they have obtained final subdivision tract map approval under the Map Act, met the requirements of the Common Interest Development Act, and obtained a final report granting the

---

did not confer a right to sell the rental units as condominiums, did not determine whether Ordinance 114U should apply to these newly sold units; it left the issue to be addressed by the City as it implemented the ordinance.

Subsequently, the City, under ordinance No. 245U, issued substitute conditional use permits approving the conversion of those units purchased while the appeal was pending in the Court of Appeal, and granting the right to convert other units pursuant to settlement agreements with the owners of entire apartment buildings.

[2] All subsequent statutory references are to the Government Code unless otherwise noted.

[3] The Subdivided Lands Act is a consumer protection statute intended primarily to prevent "fraud and sharp practices" by requiring disclosure of all relevant information to potential purchasers and lessees of subdivision lots in a project of five or more units. (*In re Sidebotham* (1938) 12 Cal.2d 434, 436 [85 P.2d 453, 122 A.L.R. 496]; *Westbrook* v. *Summerfield, Roberts, etc., Inc.* (1957) 154 Cal.App.2d 761, 766 [316 P.2d 691]; see also Bus. & Prof. Code, §§ 11000, 11004.5.) The focus of the Subdivided Lands Act is not to provide ongoing supervision or regulation of the marketing and operation of the project, but rather to ensure that its standards are met by means of a prereport review (Bus. & Prof. Code, §§ 11018, 11025).

right to subdivide from the Department of Real Estate under the Subdivided Lands Act.

The issue arises because at the time the City enacted its ordinance, defendants had not yet sold a single unit as a condominium. Civil Code section 1352 defines a condominium as the conveyance of a separate interest coupled with an interest in the common area or membership in the association created to manage the development, and the recording of (a) a declaration (*id.*, § 1353), (b) a condominium plan (*id.*, § 1351, subd. (e)) if any exists, and (c) a final map or parcel map if required by the Map Act. Under the statutory definition of a condominium, therefore, an apartment building is not converted into a condominium project until at least one unit has been conveyed, even if the owner has obtained all the governmental approvals and recorded all the documents necessary to subdivide and sell individual apartments as condominiums. (See *County of Los Angeles* v. *Hartford Acc. & Indem. Co.* (1970) 3 Cal.App.3d 809, 814 [83 Cal.Rptr. 740] ["There can be no undivided interest in common (and thus by statutory definition there can be no condominium) until at least one condominium unit has been conveyed by the subdivider."].) The City concedes that once defendants sell a unit, the conversion is complete and the newly enacted regulations may not be enforced.

Defendants contend the requirement of the sale of a unit is purely technical. They reason that because they have satisfied all the elements necessary to the creation of a common interest development, the City cannot impose on them additional conditions. We agree with this contention. It is irrelevant whether defendants sold a unit before Ordinance 114U was enacted because they had already obtained all the necessary approvals to do so. Common ownership, which is achieved by sale of an individual unit, is only a definitional element of a condominium. (Ross, *Condominium in California—The Verge of an Era* (1963) 36 So.Cal.L.Rev. 351 ["Condominium *means* common ownership"].) It is not an element that must be satisfied before an owner's right to sell is immune from conditions imposed by a city on the exercise of that right.

Moreover, some of the Map Act's provisions are designed to safeguard the investments and expectations of developers involved in conversion projects. (See, e.g., §§ 66474.1, 66474.2, 65961.) We believe that setting a definite date for an owner to proceed with a condominium conversion free of subsequently enacted regulation comports with this intent.

Similar principles of fairness formed the basis of our unanimous holding in *Youngblood* v. *Board of Supervisors* (1978) 22 Cal.3d 644 [150 Cal.Rptr. 242, 586 P.2d 556]. In that case we held that a county lacked discretion

under the Map Act to deny a final subdivision map if the application showed the development substantially conformed to the tentative map and its attendant conditions. We reasoned, "the date when the tentative map comes before the governing body for approval is the crucial date when that body should decide whether to permit the proposed subdivision. Once the tentative map is approved, the developer often must expend substantial sums to comply with the conditions attached to that approval. These expenditures will result in the construction of improvements consistent with the proposed subdivision, but often inconsistent with alternative uses of land. Consequently it is only fair to the developer and to the public interest to require the governing body to render its discretionary decision whether and upon what conditions to approve the proposed subdivision when it acts on the tentative map." (*Id*. at pp. 655-656.)

Although the majority in *Santa Monica Pines, supra*, 35 Cal.3d at page 866, expressed doubt that the analysis in *Youngblood* v. *Board of Supervisors, supra*, 22 Cal.3d 644, could apply to condominium conversions because such projects generally do not require vast expenditures to comply with conditions attached to tentative map approval, we believe that where, as here, a developer secures all state approvals to convert and the only remaining act required to complete the conversion is to convey title to a single unit, the *Youngblood* reasoning is persuasive. We therefore hold that local agencies cannot enforce condominium conversion regulations enacted after a developer secures final subdivision map approval and permission from the Department of Real Estate to sell. Ordinance 114U may of course be applied to newly proposed conversions,[4] but it cannot be enforced against these defendants.

We recognize that our conclusion is arguably inconsistent with the majority opinion in *Santa Monica Pines*. In that case the local rent control board denied developers who had obtained final subdivision map approval an exemption from a subsequently enacted rent control ordinance requiring them to satisfy additional conditions. After concluding that the developers had no vested right to proceed free of rent control, the majority also held that the local ordinance was not preempted by the Map Act. ██ ██ ██ ██ They reasoned that the City of Santa Monica's purpose in requiring apartment owners to obtain a permit before they could remove an apartment from the controlled rental housing market—i.e., to "effectuate the city's rent control law"—was distinct from the purposes of the Map Act, which was stated to be "fundamentally to control the design and improvement of subdivisions and to protect the buying public from exploitation." (*Santa Monica Pines, supra*, 35 Cal.3d at p. 869.)[5]

[4] Civil Code section 1352 requires an approved tract or parcel map, and no new map can be approved by the City without compliance with its local laws, including the ordinance.

[5] The fact that defendants in this case obtained final map approval whereas the property owners in *Santa Monica Pines* secured only tentative map approval is not a significant basis

*Santa Monica Pines,* however, attributes an inappropriately minor role to the Map Act as it relates to condominium conversion. In stating that the Map Act, as it relates to condominium conversion, is "primarily concerned" with ensuring tenants' rights to purchase their apartments on conversion of their building (*Santa Monica Pines, supra,* 35 Cal.3d at p. 866, fn. 6), the opinion overlooks the fact that the Map Act details the procedure by which a developer secures approval to proceed with a conversion. *Santa Monica Pines* should therefore not be followed insofar as it holds that a city may impose conditions on condominium conversion after a developer has secured all the necessary discretionary approvals and satisfied all the requirements established by state law.

Contrary to the City's contention, *Griffin, supra,* 39 Cal.3d 256, does not compel a different result. In *Griffin* the developer of an apartment complex applied for a special use permit to convert a recently completed apartment complex into condominiums. Because the project did not conform to the city's standards for new condominiums, however, the City of Oxnard denied the developer's application for a special use permit, a variance, and a tentative subdivision map. Thus, unlike defendants, the developer lacked tentative, much less final, subdivision map approval to convert.

Nor is this case controlled by *Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785 [132 Cal.Rptr. 386, 553 P.2d 546] (*Avco*). In *Avco,* while the developer had obtained final map approval, it had not secured a necessary building permit prior to the effective date of a statute requiring a permit from the California Coastal Zone Commission. Consequently, we held the developer did not have a vested right to proceed without complying with the laws in effect at the time the building permit was issued, including the laws that were enacted after the application for the permit. (*Id.* at p. 795, and cases cited.) ▮ Here, final map approval and issuance of the public report were the last approvals defendants needed to sell a unit as a condominium; they did not require any further discretionary permits.

Nor are we confronted by the same policy consideration that inspired the *Avco* decision. In that case we were concerned that to grant a developer a vested right to proceed on issuance of a subdivision map, or any other preliminary approval, would impair the government's right to control land

---

for distinguishing the two cases. Tentative map approval is the final discretionary approval issued by a local government under the Map Act; final map approval is merely ministerial if the application for such approval is in substantial compliance with the tentative map and its attendant conditions. (*Youngblood* v. *Board of Supervisors, supra,* 22 Cal.3d at p. 655; § 66474.1; *Great Western Sav. & Loan Assn.* v. *City of Los Angeles* (1973) 31 Cal.App.3d 403, 410 [107 Cal.Rptr. 359].)

use policy by impressing lots previously subdivided—but on which no building had been constructed—with an "exemption of indeterminate duration from the requirements of any future zoning laws." (*Avco, supra,* 17 Cal.3d at pp. 797-798; see also *Kappadahl* v. *Alcan Pacific Co.* (1963) 222 Cal.App.2d 626 [35 Cal.Rptr. 354]; *Gisler* v. *County of Madera* (1974) 38 Cal.App.3d 303 [112 Cal.Rptr. 919].) No such concern arises here.

We thus reject the City's contention that subsequently enacted legislation must be enforceable against a subdivider, absent a vested right to proceed, in order for cities to exercise meaningful planning and land use control. In this case we are concerned only with landowners in defendants' position, i.e., those who secured every necessary permit for a conversion project that required no further construction, and thus no additional government approvals. That defendants have yet to sell a unit is a trivial factor that has no effect on the City's zoning and planning power. Indeed, consequences to the zoning power are scarcely different from what inevitably results whenever a permit is deemed to be final.

Moreover, there is no substance to the distinction the City draws between its ability to regulate conversion when no units have been conveyed and its inability to do so when even a single unit in an apartment building has been sold. While a conveyance does complete the conversion process pursuant to Civil Code section 1352, the distinction is negligible as far as a local government's zoning and planning powers are concerned, especially when the unit is only one of many in a large apartment complex. The policy concern underlying *Avco, supra,* 17 Cal.3d 785, therefore, does not favor a holding that the City may regulate defendants' condominium conversions until such time as the conversion is complete by the sale of one unit.

We also reject the City's claim that even though defendants have all the discretionary approvals necessary for condominium conversion, they still need, in the absence of vested rights, either a vesting tentative map or a development agreement in order to proceed free of subsequent local regulation.[6]

---

[6] Landowners may apply for a vesting tentative map whenever the Map Act requires a tentative map. The vesting tentative map gives a developer a *vested right* to proceed with development, including the right to obtain all necessary building permits and discretionary approvals, in accordance with the local ordinances, policies and standards in effect when the application for the vesting tentative map was complete. (§ 66498.1.)

Similarly, development agreements (§§ 65864-65869.5) between a developer and a local government limit the power of that government to apply newly enacted ordinances to ongoing developments. Unless otherwise provided in the agreement, the rules, regulations, and official policies governing permitted uses, density, design, improvement, and construction are those in effect when the agreement is executed. (§ 65866.)

■ The purpose of the vesting tentative map and the development agreement is to allow a developer who needs additional discretionary approvals to complete a long-term development project as approved, regardless of any intervening changes in local regulations. (See Januta & Boyd, *Development Agreements and Uncertainties in the Development Approval Process* (1982) 5 Real Prop. L. Rptr. 49; § 66498.9 [vesting tentative map].) ■ In this instance defendants did not need a vesting tentative map or a development agreement with the City because no further discretionary permits were required in order for them to proceed.

## II

■ Defendants also claim that section 27281.5 required the City to record Ordinance 114U against their title as a restriction on their right to convey. Section 27281.5 provides that a restriction imposed by a governmental entity on the ability of an owner to convey real property must be recorded to provide constructive notice, and that such recording is a condition to the validity of the restriction. Because the City did not properly record the ordinance, defendants contend, it is unenforceable against them. Although the question is moot in view of our holding, we nevertheless reject the contention.

First, section 27281.5 is inapplicable on its face to Ordinance 114U. The ordinance does not purport to limit defendants' right to convey their entire buildings, only their right to convert individual units for use as condominiums without obtaining a conditional use permit. Even if section 27281.5 could be read to require recording restrictions on conversions, however, the section also declares that it is not to be construed to diminish a governmental entity's authority to impose such restrictions. (§ 27281.5, subd. (c).) Local authorities have the power to regulate condominium conversions under both the Map Act (§ 66411) and the police power (Cal. Const., art. XI, § 7). (See *Santa Monica Pines, supra*, 35 Cal.3d at pp. 868-869.) Section 27281.5 by its terms does not diminish that authority.

Second, there is a general presumption that each person knows the governing law. (See, e.g., *People v. Munroe* (1893) 100 Cal. 664, 670 [35 P. 326].) Indeed, in other contexts, courts have presumed knowledge of a zoning ordinance. (See, e.g., *O'Hagen v. Board of Zoning Adjustment* (1971) 19 Cal.App.3d 151, 160 [96 Cal.Rptr. 484] [permittee presumed to know of zoning ordinance providing that use permits can be revoked by Board of Zoning Adjustment for good cause].) Thus, an ordinance of general applicability like Ordinance 114U imparts constructive notice of its terms to parties seeking to convey condominium units.

Finally, the conclusion that Ordinance 114U applies to defendants, even though the City did not record its restrictions against defendants' title, is supported by considering the consequences that would flow from a contrary holding. (See *Estate of Ryan* (1943) 21 Cal.2d 498, 512-513 [133 P.2d 626].) If we were to hold that Ordinance 114U is invalid as applied to defendants because the City failed to record it as a restriction on their title, local governments would be forced to record all zoning ordinances of citywide or countywide applicability—if they affected an owner's right to convey title—against the record title of each holder of affected real property. This would be an unreasonable burden to impose on the zoning power of local governments, and we will not presume that the Legislature intended to impose such a burden unless its intention to do so is clearly manifested. Accordingly, we conclude that the City was not required to record Ordinance 114U as a restriction against defendants' title under section 27281.5.

The judgment of the Court of Appeal is reversed with directions to affirm the order of dismissal.

Lucas, C. J., Panelli, J., Arabian, J., and Baxter, J., concurred.

**BROUSSARD, J.,** Dissenting.—The newly incorporated City of West Hollywood (City) sought to impose a permit requirement on condominium developers who had complied with the state scheme regulating condominium conversions, but who had not as yet sold any condominium units or undertaken any renovation. The majority frustrate the City's efforts to set land use policy by denying it the authority to regulate the change of use involved in a condominium conversion project, even though the developers failed to demonstrate any detrimental reliance on the final subdivision map approval they had obtained. Thus, the majority confer on those who plan condominium conversions without new construction a vested right to develop once they obtain final map approval, in flat contradiction of the vested rights doctrine which has been settled in this state for many years. Accordingly, I dissent.

It is well established that a municipality has authority to regulate land use within its boundaries unless the state has preempted that authority. (Cal. Const., art. XI, § 7; Gov. Code, §§ 66427, 66427.1, subd. (e), 66427.4, 65850.) The municipality's police power includes authority to regulate the conversion of rental housing to condominiums. (*Griffin Development Co.* v. *City of Oxnard* (1985) 39 Cal.3d 256, 263 [217 Cal.Rptr. 1, 703 P.2d 339].) Municipal authority over condominium conversions is not preempted by the Subdivision Map Act (Map Act). (*Santa Monica Pines, Ltd.* v. *Rent Control Board* (1984) 35 Cal.3d 858, 869 [201 Cal.Rptr. 593, 679 P.2d 27].) The Map Act, in fact, was not intended to occupy the field of condominium

conversion regulation. (*Griffin Development Co.* v. *City of Oxnard, supra,* 39 Cal.3d at p. 262.)

We have made it clear that the requirements of the Map Act do not preempt local ordinances that require a condominium conversion use permit substantially the same as the permit requirement at issue here. (*Griffin Development Co.* v. *City of Oxnard, supra,* 39 Cal.3d at pp. 260-262.) The majority's assertion that the Map Act provides "the" requirements applicable to condominium conversion flouts our decisions in *Griffin Development* and *Santa Monica Pines* and improperly denies the municipality's authority to regulate land use within the community.

Local governments planning for the future cannot be unduly hampered by land use decisions of the past. (*Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785, 797-798 [132 Cal.Rptr. 386, 553 P.2d 546].) Thus, new land use regulations normally apply to development proposals that are already in the administrative pipeline, unless the developer can show a vested right to proceed with development free of the new regulations. The requirement that the developer show a vested right to proceed with the development before being free of newly enacted local land use regulations has long been established. (See *id.* at pp. 795-796; *Russian Hill Improvement Assn.* v. *Board of Permit Appeals* (1967) 66 Cal.2d 34, 40, 45-46 [56 Cal.Rptr. 672, 423 P.2d 824]; Curtin & Merritt, Cal. Subdivision Map Act Practice (Cont.Ed.Bar 1987) § 6.28, p. 146; Hagman et al., Cal. Zoning Practice (Cont.Ed.Bar 1969) § 5.53, p. 169; Williams, Cal. Zoning Practice (Cont.Ed.Bar Supp. 1989), §§ 5.53-5.60, pp. 174-184; Wagner et al., Cal. Condominium and Planned Development Practice (Cont.Ed.Bar 1984) § 2.5, pp. 50-51, *id.* (Cont.Ed.Bar Supp. 1989) § 2.5, pp. 30-33; 1 Hanna, Cal. Condominium Handbook (2d ed. 1986) § 16.30, pp. 549-552; see also *Russ Bldg. Partnership* v. *City and County of San Francisco* (1988) 44 Cal.3d 839, 845-846 [244 Cal.Rptr. 682, 750 P.2d 324]; *Pardee Construction Co.* v. *City of Camarillo* (1984) 37 Cal.3d 465, 472, fn. 9 [208 Cal.Rptr. 228, 690 P.2d 701]; *Leavenworth Properties* v. *City and County of San Francisco* (1987) 189 Cal.App.3d 986, 994 [234 Cal.Rptr. 598]; *Raley* v. *California Tahoe Regional Planning Agency* (1977) 68 Cal.App.3d 965, 975 [137 Cal.Rptr. 699]; *Kappadahl* v. *Alcan Pacific Co.* (1963) 222 Cal.App.2d 626, 633 [35 Cal.Rptr. 354], disapproved on other grounds in *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 517, fn. 16 [113 Cal.Rptr. 836, 522 P.2d 12].)

The vested rights doctrine is based on the doctrine of equitable estoppel. (*Avco Community Developers, Inc.* v. *South Coast Regional Com., supra,* 17 Cal.3d at p. 793.) The doctrine is not to be applied against the government "except in unusual cases where necessary to avoid grave or manifest injus-

tice" and with due consideration for any effect of an estoppel on the achievement of public policy goals. (*Hock Investment Co.* v. *City and County of San Francisco* (1989) 215 Cal.App.3d 438, 449 [263 Cal.Rptr. 665]; see *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 496-497 [91 Cal.Rptr. 23, 476 P.2d 423]; *Raley* v. *California Tahoe Regional Planning Agency, supra,* 68 Cal.App.3d 965, 975; *Kappadahl* v. *Alcan Pacific Co., supra,* 222 Cal.App.2d 626, 633.)

Unless some vested right is involved, a developer has no right to demand that the law in effect at the time of his or her first application with the municipality be applied to the ultimate decision whether to permit subdivision, building, or conversion. (*Santa Monica Pines, Ltd.* v. *Rent Control Board, supra,* 35 Cal.3d 858, 867 [tentative subdivision map act approval no bar to application of later rent control ordinance to developer's condominium conversion]; *Avco Community Developers, Inc.* v. *South Coast Regional Com., supra,* 17 Cal.3d 785, 795-796 [zoning changes applicable to building permit decisions]; *Hock Investment Co.* v. *City and County of San Francisco, supra,* 215 Cal.App.3d 438, 446; *Palmer* v. *Board of Supervisors* (1983) 145 Cal.App.3d 779, 781 [193 Cal.Rptr. 669]; Hagman et al., Cal. Zoning Practice, *supra,* §§ 5.54-5.60, at pp. 174-184.)

While a developer has a right to a final subdivision map after complying with tentative map conditions (*Youngblood* v. *Board of Supervisors* (1978) 22 Cal.3d 644, 652 [150 Cal.Rptr. 242, 586 P.2d 556]), the approval of a map has never conferred a vested right to proceed with the development. "To hold that the county could be estopped from performing this [zoning and planning] function by the filing of a map would be to fly in the face of an express statutory grant. The simple act of filing a map would destroy the power of the planning commission, the zoning board and the local legislative body to *ever* permit the use of land for purposes other than those specified on the map, or as zoned at the time the map was filed. The uses to which a parcel could be put would be irrevocably fixed for all time. [Citation.] There is no indication in the Subdivision Map Act [citation] that such a result was intended by the Legislature." (*Kappadahl* v. *Alcan Pacific Co., supra,* 222 Cal.App.2d 626, 633-634.)

It is also clear that the completion of the permit process itself does not convey any vested rights. Even after the issuance of a building permit, new ordinances may apply unless the developer has detrimentally relied on the permit to the extent that a vested right has developed. "[E]ven after a permit has been issued, it may be revoked by an administrative body on the basis of a subsequent change in the zoning laws unless the permittee has made substantial improvements in good faith reliance on the permit." (*Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 125

[109 Cal.Rptr. 799, 514 P.2d 111]; *Russian Hill Improvement Assn.* v. *Board of Permit Appeals, supra,* 66 Cal.2d 34, 39; *Brougher* v. *Board of Public Works* (1928) 205 Cal. 426, 432-435 [271 P. 487].)

As Justice Mosk succinctly and correctly explained in an earlier case: "The rule long established in this state and in most other jurisdictions is that the mere acquisition of a building permit affords a builder no protection against a change in the zoning laws adopted after its issuance and that, in order to continue the construction of a project initiated prior to a change in the law, a builder must have obtained a vested right by making substantial expenditures for construction in good faith reliance on the permit prior to the effective date of the new law. [Citations.] Although the foregoing cases generally involve a change in the zoning law which thereafter prohibited a use previously permitted, the same principle is applicable where, as here, a further requirement is imposed by change in the law, i.e. the need for an additional permit . . . ." (*San Diego Coast Regional Com.* v. *See the Sea, Limited* (1973) 9 Cal.3d 888, 894 [109 Cal.Rptr. 377, 513 P.2d 129] (dis. opn. of Mosk, J.).)

Thus, until today, neither the approval of a tentative or final subdivision map nor the completion of the permit process has been considered to confer a vested right to proceed with development free of the requirements of newly enacted land use ordinances. (*Santa Monica Pines, Ltd.* v. *Rent Control Board, supra,* 35 Cal.3d at pp. 865-867; *Avco Community Development, Inc.* v. *South Coast Regional Com., supra,* 17 Cal.3d at p. 795; *McMullan* v. *Santa Monica Rent Control Bd.* (1985) 168 Cal.App.3d 960, 963 [214 Cal.Rptr. 617]; *Palmer* v. *Board of Supervisors, supra,* 145 Cal.App.3d 779, 783; *Oceanic California, Inc.* v. *North Central Coast Regional Com.* (1976) 63 Cal.App.3d 57 [133 Cal.Rptr. 664]; *Gisler* v. *County of Madera* (1974) 38 Cal.App.3d 303, 308-309 [112 Cal.Rptr. 919]; see also Curtin & Merritt, Cal. Subdivision Map Act Practice, *supra,* § 6.22, at pp. 138-140.) This rule applies to condominium projects. (*Santa Monica Pines, Ltd.* v. *Rent Control Board, supra,* 35 Cal.3d at pp. 865-867; *Blue Chip Properties* v. *Permanent Rent Control Bd.* (1985) 170 Cal.App.3d 648, 661-662 [216 Cal.Rptr. 492] [conversion project]; *Hazon-Iny Development, Inc.* v. *City of Santa Monica* (1982) 128 Cal.App.3d 1, 9-10 [179 Cal.Rptr. 860]; cf. *People* v. *H & H Properties* (1984) 154 Cal.App.3d 894 [201 Cal.Rptr. 687] [final map gave vested right to proceed with condominium conversion, but not to be free of the requirements of a rent control ordinance enacted after final map approved].)

Accordingly, developers and their attorneys have heeded the following advice from the experts: "[T]he subdivider does not automatically obtain a vested right to complete the project on compliance with tentative map

conditions and approval of the final map by the local agency. [Citations.] Until the developer's rights have vested under California's vested rights doctrine, the right to complete the project remains subject to subsequent police power enactments by the local agency and subsequent state legislation." (Curtin & Merritt, Cal. Subdivision Map Act Practice, *supra*, § 6.28, at p. 146.) "Once a developer has obtained a use permit for a condominium project, together with tentative and final map approval, he is not necessarily 'home free' with respect to building the project. The project may still have to run the gauntlet of a down-zoning referendum or adoption of a rent control ordinance." (1 Hanna, Cal. Condominium Handbook, *supra*, § 16.30, at p. 549.) I see no justification for the majority's deviation from settled law, which is apparently well understood among practitioners.

The majority opinion is inconsistent with legislative intent, as well as with case law and commentary. The Legislature does not consider final subdivision map approval under Government Code sections 66473 through 66474.10 as the point at which developers can claim a vested right to proceed free of the requirements of new enactments. In response to the hardship and uncertainty that it perceived that the vested rights doctrine sometimes imposes on developers, the Legislature has adopted a special "Vested Subdivision Map" application process which *does* assure the developer that the local laws applicable at the time of the tentative map approval will continue to apply throughout the map approval and permit process. (See Gov. Code, §§ 66498.1-66498.7, added by Stats. 1984, ch. 1113, § 8, p. 3744, operative Jan. 1, 1986; Gov. Code, § 66498.8, added by Stats. 1985, ch. 249, § 2, operative July 26, 1985; see also Nadel, *This Land Is Your Land . . . Or Is It? Making Sense of Vested Rights in California* (1989) 22 Loyola L.A. L.Rev. 791, 819.) The stated intent of this article of the Government Code, enacted after the subdivision approval in the present case, is "To ensure that local requirements governing the development of a proposed subdivision are established . . . when a local agency approves or conditionally approves a vesting tentative map. The private sector should be able to rely upon an approved vesting tentative map prior to expending resources and incurring liabilities without the risk of having the project frustrated by subsequent action by the approving local agency . . . ." (Gov. Code, § 66498.9. subd. (b).) The negative pregnant is manifest. It is only when the developer designates the map application as a vesting map and meets requirements for such a map established by local governments that the developer is entitled to the assurance that the law applicable to his or her development will not change after the map approval stage.

The majority assert that fairness to the developer requires that new ordinances not apply after final map approval. They rely on *Youngblood* v. *Board of Supervisors, supra,* 22 Cal.3d 644, where we held that fairness to

the developer and public required that we interpret the Map Act to assure a developer final map approval once he or she has complied with tentative map conditions, in part because of the substantial expenditures a developer undertakes in reliance on tentative map approval. (*Id.* at p. 655.) The case has nothing to say on the precise point at issue here, since it merely interprets the circumstances under which final map approval must be accorded, without examining whether a municipality can impose other requirements outside the terms of the Map Act. (See *Santa Monica Pines, Ltd.* v. *Rent Control Board, supra,* 35 Cal.3d at pp. 865-866.) The case is significant, however, because it defines fairness to the developer in terms of concern for the developer's *expenditures* in reliance on Map Act approval. This coincides with the established law of the vested rights doctrine, under which fairness exempts a developer from new ordinances only when he or she can demonstrate detrimental reliance. No such detrimental reliance has been shown here.

Whether or not subdivision map approval is the last application process through which the state regulatory scheme requires the condominium developer who plans no building to go, approval of the map should not bar the application of later changes in land use law unless the developer can demonstrate detrimental reliance on the map approval. The developer in this case has not even attempted to demonstrate such detrimental reliance. I fail to see how a developer who merely plans to change the nature of ownership of a building, without undertaking any construction or other expenses, has detrimentally relied on the subdivision map approval to the extent that he or she is equitably entitled to estop the government from applying its general land use regulations to his property. The majority silently erode the vested rights doctrine when they confer what can only be termed a vested right to develop without requiring any showing of detrimental reliance.

Kennard, J., concurred.

Appellant's petition for a rehearing was denied April 25, 1991. Broussard, J., and Kennard, J., were of the opinion that the petition should be granted.